UNITED STATES of America ex rel. James CARTER, Relator,

v.

Honorable Vincent R. MANCUSI, as Warden of Attica State Prison, Attica, New York, Respondent.

No. 71 Civ. 2560-LFM.

United States District Court, S. D. New York.

Nov. 5, 1971.

Robert Kasanof, New York City, for relator.

Louis J. Lefkowitz, Atty. Gen. of State of New York, for respondent; Carol Berkman, Asst. Atty. Gen., of counsel.

## MEMORANDUM

MacMAHON, District Judge.

Petitioner, James Carter, confined in Attica Correctional Facility, Attica, New York, collaterally challenges under 28 U.S.C. § 2254 a conviction for rape in the first degree and an indeterminate sentence of twenty-five years imposed by the Supreme Court, Bronx County, on September 19, 1969, sitting without a jury. Petitioner's conviction was affirmed by the Appellate Division, First Department, on June 4, 1970 and by the New York Court of Appeals on January 6, 1971, both without opinion. The Court of Appeals, on February 4, 1971, amended its remittitur to state that it had passed upon petitioner's contentions under the Fourth, Sixth and Fourteenth Amendments and had found no denial of constitutional rights.

Petitioner now claims violations of the Fourth and Fourteenth Amendments, alleging that the in-court identification of him was tainted, first, because he was identified by the victim during a line-up held in the police station while he was detained without probable cause and, second, because fifteen months after the crime the prosecutor showed two key witnesses photographs of him just before they testified on the trial. Determination of petitioner's contention requires a brief review of the facts.

On January 21, 1968, a seven-year-old girl, Tammy Small, was raped on the ground floor of the apartment building in which she lived. When the police arrived, they elicited from Tammy an approximate description of her attacker and that he had mentioned the name "Debra." Acting on this lead, the police asked a girl by that name, who had lived in Tammy's building, to produce a list of her ex-boy friends. Donald Carter, petitioner's brother, was on the list.

Six police officers visited Donald Carter's apartment at eleven o'clock that evening and questioned both Donald and petitioner. The brothers consented to accompany the officers to the station house. Once there, petitioner consented to stand in a line-up with his brother and was identified by Tammy Small through a one-way mirror as the attacker. Petitioner was forthwith placed under arrest and given the *Miranda* warnings.

Two key witnesses upon the trial placed petitioner in Tammy Small's apartment building on the day of the crime. Valerie Gregg testified that she saw petitioner about 4:00 P.M., an hour and one-half before the rape. Paula Small testified that she saw petitioner in the building once in the morning and again at 5:30 or 6:00 P.M. Neither witness spoke with the police or prosecutor about their observations until more than a year later.

Mrs. Gregg was first approached fourteen months after the crime. A detective showed her a line-up photograph of five men, and she identified petitioner. The photograph showed petitioner wearing a black, three-quarter length leather jacket dissimilar to the jackets worn by three of the four others, and his age and appearance also differed markedly.

Mrs. Small was first approached thirteen months after the crime and, although she told the police that she thought she could make an identification, nothing was done about it until the day of the trial, two months later.

On the morning of the trial, both witnesses were shown a police "mug" shot and a full-length photograph of petitioner by the district attorney.

■ The guidelines for determining petitioner's tainted identification claim are found in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). *Stovall* and *Simmons* teach a two-pronged inquiry: whether the initial identification procedure was unnecessarily or impermissibly suggestive and, if so, whether the procedure was so conducive to irreparable mistaken identification or has such a tendency to give rise to a very substantial likelihood of irreparable misidentification that allowing the witness to make an in-court identification would be a denial of due process. United States ex rel. Phipps v. Follette, 428 F.2d 912, 914–915 (2d Cir. 1970).

We, therefore, consider first whether the prosecutor's action in showing the photographs to the witnesses just before they testified was "unnecessarily" or "impermissibly" suggestive. We, thus, consider the facts pertinent to the first essential inquiry.

■ Mrs. Small testified that the photographs bore New York City Police legends and that she viewed them about fifteen seconds "to make sure." The inference seems clear that Mrs. Gregg, shown the same photographs, was similarly uneasy. Corroboration of the victim's testimony was required under New York law, and surely, both witnesses were aware that they were expected to make a positive identification in the courtroom later that morning. We think that the failure to anchor the eyewitness identification earlier in a prompt and proper line-up, the timing, the focus on petitioner, and the circumstances surrounding the photographic session compel the conclusion that the identification procedure here was unnecessarily and impermissibly suggestive. Mason v. United States, 134 U.S.App.D. C. 280, 414 F.2d 1176, 1182 (1969).

We consider next, therefore, whether the photographic session was "so conducive to irreparable mistaken identification" or had such a tendency "to give rise to a very substantial likelihood of irreparable misidentification" that petitioner was denied due process of law when the witnesses were allowed to identify petitioner in court.

■ *Phipps* lists the various factors to be considered as: (1) the witnesses'

opportunity for observation, (2) the motivation for careful observation, (3) the lapse of time between initial observation and trial, (4) the period of time between the suggestive identification and trial, and (5) the witnesses' observation of the defendant at the counsel table. 428 F.2d at 915. We add two other factors: the positiveness of the witness on cross-examination that her in-court identification is independent of any prior suggestion, and the fact that the witness was actually cross-examined on this issue. We note the existence of opposing opinions regarding the relevancy of the witnesses' own assertions in this area but agree with Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968) (en banc), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969), where the court said: "the positiveness of the witness . . . is a relevant factor . . . to be weighed warily and in the realization that the most assertive witness is not invariably the most reliable one." 408 F.2d at 1242.

It is clear that the witnesses had substantial opportunity for observation. Mrs. Gregg testified that at four o'clock in the afternoon she stopped to look at petitioner whose presence on the stairway landing was called to her attention by her nephew, who reported to her that "that boy has been sitting there for practically all day." The entire episode took five or six minutes. She, thus, had ample time and good réason to study the features of the person sitting in her path. Moreover, Mrs. Gregg was able to make a positive identification of petitioner from the line-up photograph shown to her one month before the trial. We recognize the weaknesses of the line-up photograph described above, but we do not agree that the focus on petitioner was so blantantly unfair as to require us to ignore its probative value in determining whether a substantial likelihood of misidentification existed.

Mrs. Small's testimony stands in much the same light. She testified that she was so startled by the petitioner, sitting on the stairway landing in front of Tammy Small's apartment at nine o'clock in the morning, that she asked him: "what are you doing here?" Moreover, she observed him again when she left the Small's apartment shortly thereafter. Mrs. Small further testified that at 5:30 that afternoon, petitioner ran past her in the apartment vestibule, nearly knocking her down. Although her testimony did conflict at one point on whether she got a look at his face as he came by, she did testify with assurance that "by the time he got past me I seen half his face and I seen him."

Mrs. Small insisted that her initial observation constituted the sole foundation for her identification. Vigorous cross-examination failed to shake her certainty, and the state court expressed complete satisfaction with her story. We see no reason why we should not defer to the state court's judgment. United States ex rel. Phipps v. Follette, *supra*, 428 F.2d at 915.

Both witnesses arrived in court firm in their initial impression of petitioner, and their last minute look at photographs of petitioner, at the request of the prosecutor, appears only to have verified in their own minds the identification they had planned to make from the outset. We do not find, therefore, that the impermissibly suggestive photographs shown to the witnesses on the morning of the trial gave rise to a substantial likelihood of misidentification.

Petitioner's second claim is more complex. He asserts that his detention in the police station, from the time he arrived until his formal arrest two hours later, was based on less than probable cause and was therefore a violation of the Fourth Amendment guarantee against unlawful arrest. As a consequence, petitioner says the line-up identification of him by the victim during the "unlawful" detention should have been suppressed at the trial.

Implicit in petitioner's contention is the assumption, first, that he was under arrest or formal detention, and, second,

that if he were it was without probable cause. . Only an affirmative finding on both of these points would enable us to find that the detention was illegal. Shortcomings of the record, however, preclude determination of that issue, and we find it unnecessary to resolve in any event.

■ The dispositive query is whether petitioner's participation in the line-up itself was the product of what we will assume to be an illegal detention. In Morales v. New York, 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969), the defendant, when informed that the police wished to talk with him, agreed to meet them at his mother's place of business. He was apprehended by the police at the meeting and taken to the police station where he confessed almost immediately. The New York Court of Appeals noted that Morales was not free to leave and would have been restrained had he attempted to flee at the time of his apprehension. The court also observed that the police did not have probable cause to sustain an arrest. Nevertheless, it rejected the Fourth Amendment claim on the ground that the police conduct involved was reasonable. Morales' contention "that there was *no* probable cause for his detention at the time of his confessions and that the confessions, even if voluntary, were inadmissible fruits of the illegal detention" went unanswered. The United States Supreme Court remanded the case for an evidentiary hearing on the circumstances surrounding Morales' detention and his confessions. The Court said:

"Given an opportunity to develop in an evidentiary hearing the circumstances leading to the detention of Morales and his confessions, the State may be able to show that there was probable cause for an arrest or that Morales' confrontation with the police was voluntarily undertaken by him *or that the confessions were not the product of illegal detention.*" 396 U.

S. at 105, 90 S.Ct. at 293. (Emphasis added.)

The emphasized phrase, we think, teaches that the Fourth Amendment does not require suppression of the identification here if the line-up was not the product of the assumed illegal detention. Further light is shed on our analysis by United States v. Edmons, 432 F.2d 577 (2d Cir. 1970).

In *Edmons*, the F.B.I. used arrests for failure to carry selective service cards as a pretext for bringing in for a line-up persons who were suspected of obstructing the arrest of a draft violator. The defendants contested their convictions for offenses connected with the obstruction charge on the ground that the testimony by the F.B.I. agents relating to the line-up should be excluded as the fruit of an unlawful arrest. The Court of Appeals saw the issue not as a due process question, but as a Fourth Amendment challenge, and applied the standard outlined in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The *Edmons* court quoted the *Wong Sun* standard as follows:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is '*whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.*' Maguire, Evidence of Guilt, 221 (1959)." 432 F.2d at 583. (Emphasis added.)

We, therefore, look to whether the challenged identification has been "come at" by exploitation of an illegal arrest or by means sufficiently distinguishable to be purged of the primary taint. The demarcation point between these alterna-

tives, we believe, is the occurrence of some event which not only interrupts and ends the exploitation, but also gives the investigation a fresh start.

In *Edmons,* the court barred the identification testimony under the *Wong Sun* test on the basis of some "dramatic" evidence of "flagrantly illegal arrests [which] were made for the precise purpose of securing identifications that would not otherwise have been obtained." 432 F.2d at 584. There, it appeared that from start to finish, in an uninterrupted chain of events, the arresting agents were bent on violating the defendants' Fourth Amendment rights. The case before us is clearly of a different dimension and can be located well within the boundaries of the second half of the *Wong Sun* test.

The purging event here, we think, is the undisputed fact that petitioner volunteered to participate in the line-up *after* he was told by the attending policeman that "he did not have to stand in the line-up if he didn't wish to." Indeed, petitioner's counsel concedes that "In fact the only right relator was informed of was that he did not have to stand in the line-up." That warning was neither "too little" nor "too late," as petitioner contends. Rather, it occurred at a time when petitioner was actually confronted with the choice of participating or not, and we can only conclude that the warning was in earnest and that petitioner consented to stand in the line-up freely and voluntarily.

We find, therefore, that the line-up during which Tammy Small identified petitioner was not tainted by what we have assumed to have been an illegal detention springing from an arrest without probable cause. Since the identification was not the product of the illegal detention, the petitioner's claim must be rejected.

Accordingly, petitioner's application for a writ of habeas corpus is denied in all respects, and a certificate of probable cause will not be issued by this court.

So ordered.