UNITED STATES of America ex rel.
Manuel GONZALEZ, Relator-
Appellee,

v.

John ZELKER, Warden, Green Haven
Correctional Facility, Respondent-
Appellant.

No. 413, Docket 72-1945.

United States Court of Appeals,
Second Circuit.

Argued Jan. 31, 1973.

Decided April 17, 1973.

Joseph A. DeMaro, Asst. Dist. Atty., Nassau County, Mineola, N. Y. (William Cahn, Dist. Atty., Nassau County, and Robert J. Kaschak, Asst. Dist. Atty., Nassau County, Mineola, N. Y., of counsel) for respondent-appellant.

Francis J. Valentino, Legal Aid Society of Nassau County, Mineola, N. Y. (James J. McDonough, Attorney in Charge, Legal Aid Society of Nassau County, and Matthew Muraskin and Susan Crandall, Legal Aid Society of Nassau County, Mineola, N. Y., of counsel) for relator-appellee.

Before ANDERSON, FEINBERG and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from an order of Hon. Irving Ben Cooper, United States District Court Judge for the Southern District of New York, entered on July 7, 1972, granting the relator's petition for a writ of habeas corpus, after a hearing, pursuant to 28 U.S.C. § 2241. Reversed.

On March 18, 1966 the State Laundry in Hempstead, Nassau County, New York, was robbed by two armed men. The relator Manuel Gonzalez and one James F. Castellano were indicted and convicted in the Nassau County Court after a trial by jury, receiving concur-

rent sentences of 10 to 20 years for Robbery in the First Degree; 5 to 10 years for Grand Larceny in the First Degree; 2½ to 5 years for Assault in the Second Degree and suspended sentences for Assault in the Third Degree. Both defendants appealed their convictions to the Appellate Division, Second Judicial Department, which affirmed without opinion (31 A.D.2d 1006, 299 N.Y.S.2d 389, 32 A.D.2d 889, 301 N.Y.S.2d 424 (1969)). The New York Court of Appeals subsequently affirmed 4–2 (27 N.Y.2d 53, 313 N.Y.S.2d 673, 261 N.E.2d 605 (1970)) with Chief Judge Fuld and Associate Judge Breitel dissenting. Certiorari was denied by the Supreme Court on January 11, 1971 (400 U.S. 996, 91 S.Ct. 470, 27 L.Ed.2d 445).

A writ of habeas corpus was then sought in the Southern District Court of New York on April 6, 1971. Judge Cooper referred the proceeding to United States Magistrate, Hon. Gerard L. Goettel, for report and recommendation. The Magistrate recommended that an evidentiary hearing be held and Judge Cooper so ordered. On February 3, 1972 a hearing was held before Magistrate Goettel. The principal witness, Marguerite D'Amora, was unable to attend and was deposed upon written interrogatories by the Hon. Gilbert Swink, a Magistrate of the United States District Court for the Eastern District of Virginia, the state where she now resides. On May 17, 1972 Magistrate Goettel submitted a report and recommended that the writ of habeas corpus issue. Judge Cooper adopted the report on June 19, 1972 and entered an order directing the respondent to release the petitioner unconditionally unless he was retried within sixty days. The order, however, was stayed and the petitioner is presently enlarged on bail pending the decision of this Court.

I

At the trial of this case Marguerite D'Amora testified that on March 18, 1966 she was working as a switchboard operator at the State Laundry in Hempstead, Long Island. At about 1:10 P.M. a new blue and very shiny car attracted her eye as it pulled up across the street, made a U turn and stopped in front of the laundry. Both men in the car got out and walked into the office. They were about 12 feet from her and she could clearly see their faces. She later identified the two men in court as Castellano and the relator Gonzalez. Gonzalez walked past her toward a staircase leading to the cashier's office and because it was her job to see that no one passed, she took particular notice, asking him if she could help. Gonzalez looked into another room, walked toward her and when about one foot away pointed a gun and said "This is a stickup. Come with me." Gonzalez brought D'Amora to the foot of the stairs together with another employee, Kitty Clarke. Gonzalez then placed a ski mask over his face and he and Castellano took the women up the stairs to the cashier's office. Other employees were rounded up. Gonzalez rifled the contents of the safe taking cash and employees' checks. Both men left with a blue school bag in the same blue car. The police were called.

Patrolman Guzzo testified that he was on patrol in Hempstead on March 18, 1966 shortly after 1:20 P.M. About a mile from the State Laundry he saw a blue Chevrolet. He identified on trial the State's exhibit 19 (a picture of the car Gonzalez was driving just prior to arrest) as a picture of the car he had observed and also identified Castellano as the driver, but he could not identify the other occupant. Guzzo had been cut off by the car and was about to stop it when he was advised by radio of the robbery at the laundry. He passed the car and went to the scene of the crime where he advised the detectives of the blue Chevrolet which he considered suspicious. Detective Moran testified that while checking out Guzzo's lead in Lindenhurst, shortly after 3:15 P.M., a 1960 blue Chevrolet drove past with 3 men in the front seat and with the li-

cense SK 8918.[1] He identified Gonzalez as the driver. He and Detective Kreitzman followed the car and pulled alongside. Detective Kreitzman showed his shield and ordered the car to pull over. The driver slowed down but then accelerated with the police car in pursuit, siren blaring. The Chevrolet stopped, Gonzalez said "Stop, stop, turn it off" and dashed between two houses. Castellano however remained with the car and was arrested immediately. Gonzalez was observed at a phone booth one quarter of a mile away. With helicopter assistance Gonzalez was chased through a woods and finally arrested after the firing of shots and a brief wrestling match with a policeman. After their arrest both Castellano and Gonzalez confessed that they had committed the crime charged. Gonzalez led the police to a refuse can near the location where he escaped from the vehicle and turned over to the police, checks which had been taken from the laundry. Weapons and clothing used in the robbery were also recovered as a result of information given by the relator.

## II

The sole issue before the court below and now on appeal is the reliability of the identification of Gonzalez by Mrs. D'Amora who was the sole witness on trial to identify him as one of the two robbers. The case for the State was overwhelming as of March 18, 1966. Mrs. D'Amora's eyewitness identification was not anticipated as a major factor in the trial in view of the confession and recovery of weapons, clothing and loot. From the State's point of view a conviction could be reasonably anticipated. Then on June 13, 1966 the Supreme Court decided Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, holding that a confession without appropriate warnings, even though otherwise voluntary, was inadmissible in evidence. On June 20, 1966 Johnson v. New Jersey, 384 U.S. 719, 58 S.Ct. 1019, 82 L. Ed. 1461, was decided, holding that the Miranda requirements were to be applicable to all trials subsequently conducted. The State determined not to introduce either the confession or its fruits and thus the testimony of Mrs. D'Amora for the first time assumed major significance.

On May 12, 1966 Mrs. D'Amora had testified before the Grand Jury and was shown two photographs. She identified one as the relator Gonzalez and the other as Castellano, the men she stated had robbed the laundry seven weeks before. On June 12, 1967 the United States Supreme Court decided Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, holding that in some cases an unnecessarily suggestive line-up is violative of due process. On August 10, 1967 just before the trial, she was shown the photograph of Gonzalez whom she again identified as the man who robbed the laundry on March 18, 1966. She adhered to this identification on trial under rigorous cross-examination. The confession of Gonzalez and the evidence of the recovery of the weapon and the fruits of the crime, were not before the jury and were not sought to be introduced by the State. Evidence was offered to establish Gonzalez' presence in the blue Chevrolet after the robbery as well as his flight and capture. On March 18, 1968 the Supreme Court decided Simmons v. United States, 390 U. S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, holding that an unnecessarily suggestive photographic identification will, in some instances, be violative of due process. After the affirmances by the Appellate Division and Court of Appeals, the denial of the writ of certiorari, the present application for a writ of habeas corpus issued as previously set forth.

---

1. Guzzo had indicated that the Chevrolet was either a '59 or '60 model and had copied down the license as SK 8919. By the time Moran observed the robbers' auto, it had already been determined that an error had been made, since the car having license SK 8919 was a 1964 Corvair.

## III

A threshold question here is what weight, if any, we are to accord the findings of fact of the Magistrate which were adopted by the court below. Normally such findings are to stand unless clearly erroneous under Fed.R.Civ.P. 52(a). We do not consider this rule to be here applicable. Mr. Justice Powell writing the opinion for the Court in Neil v. Biggers, 409 U.S. 188, 193, 93 S. Ct. 375, 379 n. 3, 34 L.Ed.2d 401 (Dec. 6, 1972) noted:

> This rule of practice, under which the Court does not lightly overturn the concurrent findings of fact of two lower federal courts, is a salutary one to be followed where applicable. We think it inapplicable here where the dispute between the parties is not so much over the elemental facts as over the constitutional significance to be attached to them. Moreover, this is a habeas corpus case in which the facts are contained primarily in the state court record (equally available to us as to the federal courts below) and where the evidentiary hearing in the District Court purported to be "confined" to two specific issues which we deem not controlling.

We think this view is particularly appropriate here. The essential facts are contained in the state court record. The evidentiary hearing, for the most part, was unproductive, only confirming that which is suggested by the trial record: Mrs. D'Amora did not see any photographs prior to the Grand Jury hearing and then she was shown only those of Gonzalez and Castellano. At the hearing memories had faded regarding the August 10th picture showing, but Miss Pisciotto's trial testimony clearly describes the circumstance surrounding that showing of the robbers' pictures to Mrs. D'Amora. It is further noteworthy that the key witness here, Mrs. D'Amora, never testified before Magistrate Goettel but was deposed in Virginia Beach where she now resides. Hence, there was no opportunity for him to observe her demeanor and judge her veracity which is a major factor in appellate courts' normal reluctance to interfere with trial court findings of fact. United States ex rel. Miller v. LaVallee, 436 F.2d 875, 876 (2d Cir. 1970), cert. denied, 402 U.S. 914, 91 S.Ct. 1367, 28 L.Ed.2d 657 (1971):

> We have in mind that when the issue the trial judge must determine relates to the validity of a witness's identification of a defendant we ought to accord great weight to the determination the judge makes, for he has seen and has heard that witness.

Moreover, as *Biggers* points out the basic question to be determined here is the constitutional significance to be attached to the facts. On this score the Magistrate arrived at two separate conclusions of law. First, that the photographic identification was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification, Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and secondly, that the prosecution failed to sustain its burden by clear evidence that the in-court identification was based upon observations of the defendant other than the improper confrontations, citing United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The problem is that the so-called "per se" rule of *Wade* has been found by this circuit not applicable to due process photographic identification cases[2] which

---

2. The first photograph showing here was pre-*Wade* but the second showing just before trial was post-*Wade*. We note however that *Wade* involved the right to counsel at pretrial line-ups and in that context required "clear and convincing evidence" *aliunde* line-up identification. This circuit has consistently held (see, e. g., United States v. Counts, 471 F.2d 422, 425, n. 2 (1973); United States v. Johnson, 467 F.2d 630, 637 (1972), and United States v. Bennett, 409 F.2d 888, 899–900, cert. denied, 396 U.S. 852, 90 S. Ct. 113, 24 L.Ed.2d 101 (1969)) that there is no constitutional right to counsel at a *photographic* identification. We are

are to be determined by the more flexible "totality of circumstances" test of *Stovall* and *Simmons*.

█ Thus Judge Medina writing for a panel of this Court in United States ex rel. Rutherford v. Deegan, 406 F.2d 217, 218–219, cert. denied, 395 U.S. 983, 89 S. Ct. 2145, 23 L.Ed.2d 771 (1969) held:

> We think it clear that the rule of *Wade*, applicable only prospectively and requiring a hearing and finding that "the in-court identifications had an independent source" based on "clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification" or a finding that the error was harmless, is clearly not the rule governing *Stovall* or other due process of law cases. To intermingle the two separate but analogous rules of *Wade* and *Stovall* can only result in confusion . . . .
> We think it is clear that no *per se* rule governs the due process of law cases.

This position was reaffirmed in United States ex rel. Miller v. LaVallee, *supra*, 436 F.2d at 876.

While the Magistrate here espoused both rules, a reading of his final report where he discusses the legal issues indicates that in effect he adopted the "per se" approach of *Wade* espoused in United States v. Gambrill, 146 U.S.App.D.C. 72, 449 F.2d 1148, 1153 (1971).[3]

█ We conclude therefore that although the showing of a single photograph (here there were two photographs shown but only of the two defendants charged with the robbery) is impermissibly suggestive, our inquiry must be whether under all the circumstances it gave rise to a very substantial likelihood of irreparable misidentification. United States ex rel. Carter v. Mancusi, 342 F. Supp. 1356, 1357–1359 (S.D.N.Y.1971), aff'd on opinion below, 460 F.2d 1406 (2d Cir. 1972).

## IV

The ultimate issue is whether under the totality of circumstances Mrs. D'Amora was identifying Gonzalez on trial as the man whose photograph she had been shown twice or whether she had such a definite image of him in her mind before the unnecessarily suggestive showing, that she was relying on it rather than the photograph. United States ex rel. Phipps v. Follette, 428 F. 2d 912, 915 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970). Precedent is of little value in cases such as this, each of which must be judged on its own facts. Simmons v. United States, *supra*, 390 U.S. at 384, 88 S.Ct. 967. After a careful reading of the record we believe that there is no substantial likelihood that Mrs. D'Amora misidentified Gonzalez. The robbery unquestionably made a deep impression on Mrs. D'Amora who was obviously terrified by Gonzalez when he pointed the gun at her and announced the hold-up. She was only a foot away from him. She was not a casual bystander, the light was good and her attention was focussed upon him. See United States ex rel. Frasier v. Henderson, 464 F.2d 260, 264–265 (2d Cir. 1972). Her description of him, given shortly after the robbery, was, under the circumstances reasonably accurate.[4] See United States ex

---

therefore not within the *Wade* rule. We do note, however, that this issue was recently argued before the Supreme Court on January 10, 1973 in United States v. Ash, Doc. No. 71–1255, 41 U.S.L.W. 3390.

3. The court in United States v. Gambrill, *supra*, 1153, reached the conclusion "that an impermissibly suggestive photographic display should be considered to give rise to a very substantial likelihood of irreparable misidentification if the Government is unable to show, by clear and convincing evidence that a subsequent in-court identification is based on a source independent of the photographic display." (footnote omitted).

4. Mrs. D'Amora initially described Gonzalez as a male, white, 5′10″ tall, stocky build, 26 years of age and blond hair. Gonzalez was a white male, between 5′8″ and 5′9″ tall, weighed 194 lbs. and was 27 years old at the time of the robbery.

rel. Bisordi v. LaVallee, 461 F.2d 1020, 1024–1025 (2d Cir. 1972). On trial she testified at least three times that she was certain of her identification. This positive identification is a factor which is entitled to consideration. United States ex rel. Carter v. Mancusi, *supra* 342 F.Supp. at 1359. She was subjected to a thorough cross-examination which covers some 100 pages of about 500 pages of trial testimony. While there was a long period between the robbery and the trial, as Mr. Justice Harlan pointed out, the range of misidentification is lessened by cross-examination at trial. Simmons v. United States, *supra* 390 U.S. at 384, 88 S.Ct. 967. The jury to which the evidence was directed found the identification reliable and so did the appellate courts of the State of New York.[5]

We are further enlightened by Mrs. D'Amora's testimony at her deposition below.[6] After some six years Mrs.

His hair however is not blond but dark brown or black. This misdescription is not surprising under the circumstances. Gonzalez was standing under a fluorescent light when he faced Mrs. D'Amora and she was understandably nervous at the time of the robbery. She took four tranquilizers that day, apparently at least one after Gonzalez donned his mask but before the robbers left, and evidently suffered from nervousness a good while thereafter.

5. As we understand Chief Judge Fuld's dissent, he was of the opinion that the burden was on the prosecution to show by clear and convincing evidence that the in-court identification stemmed from a source independent of the two pre-trial photographic identifications (see 27 N.Y. 2d at 60; 313 N.Y.S.2d at 678, 261 N.E. 2d at 608) thus following the *Wade* test.

6. The Court: Do you remember seeing photographs of either of the persons who committed the robbery?
Mrs. D'Amora: I don't remember.
The Court: Before you testified in the Grand Jury? (pause) Did you see such pictures?
Mrs. D'Amora: I don't remember.
The Court: During your testimony in the Grand Jury? Did you see pictures?
Mrs. D'Amora: Yes, I think I did.
The Court: Before you testified at the trial?
Mrs. D'Amora: Yes, I think I did.
The Court: In the District Attorney's office?
Mrs. D'Amora: I don't remember if it was in the District Attorney's office, or where it was that they showed me pictures.
The Court: All right. The next question is, at any time? Did you see pictures?
Mrs. D'Amora: Yes, I'm sure I did.
The Court: If you do remember any such incident, would you describe what you remember about it including who the person was who showed the picture? (pause)
Mrs. D'Amora: I dont [sic] know who it was.
The Court: How many pictures were shown?
Mrs. D'Amora: There was a picture of a car shown.
The Court: Do you know how many pictures were shown to you? (pause)
Mrs. D'Amora: I don't know. I don't remember.
The Court: Who was portrayed in those pictures?
Mrs. D'Amora: I don't remember that either.
The Court: What was said to you by the person exhibiting the photographs?
Mrs. D'Amora: I don't remember that.
The Court: And, who else was present at that viewing?
Mrs. D'Amora: I was in a room, and there seemed to be a few people sitting out there.
The Court: You do not know any of the names?
Mrs. D'Amora: No, I don't.
The Court: Or their positions— whether they were police officers of [sic] who they might have been?
Mrs. D'Amora: I don't remember.
The Court: When you testified at the trial and identified Manuel Gonzalez as the man who approached you at the switchboard and eventually put on the ski mask, were you positive, in fact, that he was that man?
Mrs. D'Amora: Yes, I was.
The Court: Are you positive today that your identification of Manual Gonzalez was correct?
Mrs. D'Amora: At the time I identified him, I made my identification as what happened in the office.
The Court: Are you positive today that the identification that you gave in the trial is correct?

D'Amora had no clear recollection of the photographic identification procedures but still is sure that the man who was the defendant on trial, was the man who held her up. This strongly supports in our view the indelible imprint made by the event and the principal characters, Gonzalez and Castellano. Mrs. D'Amora identified not only Gonzalez but Castellano. His petition for a writ of habeas corpus has been denied without an evidentiary hearing[7] and denial was affirmed in open court by a panel of this Court on April 4, 1972. While this case is not at all binding here since two other witnesses identified the unmasked Castellano, it at least supports to some extent Mrs. D'Amora's reliability to identify the robbers despite the same suggestive procedure which was employed in both cases.

We should also note that while the procedure here was suggestive there is no indication at all that the police were guilty of any activity designed to unfairly influence the trial of the relator.

They were unable to anticipate *Miranda* and *Simmons* and were not attempting to circumvent normal procedures. There is no suggestion in the record that the police persuaded or coerced Mrs. D'Amora. On the contrary, our review of the minutes of Mrs. D'Amora's, Grand Jury testimony and Miss Pisciotto's trial testimony concerning the August 10th photographic identification discloses that restraint was practiced. This is further evidenced by the fact that Kitty Clarke, the only other witness to see the unmasked Gonzalez, was shown the same pictures at the same time on August 10 and was unable to identify either Gonzalez or Castellano. The confession and the fruits of the crime retrieved from it were not even sought to be introduced by the State in the trial of the alleged robbers.

■ Moreover, in determining whether or not the suggestive photographic identification procedure resulted in misidentification, we may properly consider the other factors which were before the

---

Mrs. D'Amora: Yes.

The Court: Did anything that occurred between the time of the crime and the time you testified at the trial influence you in making an identification of Manuel Gonzalez?

Mrs. D'Amora: There wasn't.

The Court: No?

Mrs. D'Amora: No.

The Court: If you had not seen any photographs of Gonzalez between the time of the crime and the time you testified at trial, would you have been able to identify him?

Mrs. D'Amora: To the best of my knowledge, as of the day he walked into my office, yes.

The Court: All right. Did you see either of the two men who committed the robbery in the courthouse prior to your testifying at the trial?

Mrs. D'Amora: I'm sorry, would you repeat that?

The Court: Did you see either of the two men who committed the robbery in the courthouse prior to your testifying at the trial? (pause) In other words, did you see them before you went on the witness stand to identify them?

Mrs. D'Amora: Yes, I did. They were walking and I was sitting in the

corridor—and they were walking in—on the other side of the room.

The Court: Could you have identified Gonzalez in court if you had not seen his photograph in the Grand Jury? (pause) I'll repeat that question. Could you have identified Gonzalez in court if you had not seen his photograph in the Grand Jury?

Mrs. D'Amora: Yes.

The Court: Could you have identified Gonzalez in court if you had not seen his photograph prior to testifying at the trial?

Mrs. D'Amora: Yes.

The Court: Did seeing Gonzalez' photograph in the Grand Jury influence your identification of him at the trial?

Mrs. D'Amora: No.

The Court: Did seeing Gonzalez' photograph prior to your testimony influence your identification of him at the trial?

Mrs. D'Amora: No.

The Court: If you had not seen any photographs of Gonzalez, would you have been able to identify him at the trial?

Mrs. D'Amora: At that time, yes.

7. United States ex rel. Castellano v. Zelker, 71–C–487 (E.D.N.Y. Dec. 8, 1971).

jury and were properly admissible which tend to establish that there was not substantial likelihood of misidentification. United States ex rel. Springle v. Follette, 435 F.2d 1380, 1384 (2d Cir. 1970), cert. denied, 401 U.S. 980, 91 S. Ct. 1214, 28 L.Ed.2d 331 (1971); United States ex rel. Phipps v. Follette, *supra* 428 F.2d at 916–917; Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1250–1252 (1968) (en banc) (Leventhal, J., concurring, joined by now Chief Justice Burger), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

In our examination of the State record we find other evidence which corroborates the identification and establishes that no violation of due process was present in the Gonzalez' trial. There was evidence that Gonzalez had been an employee of the laundry which could account for his apparent familiarity with the location of the cashier's office,[8] his awareness that Friday (the day of the robbery) was payday for the route drivers (his job) and also would account for his wearing a mask while Castellano used no disguise.[9] Moreover, the general physical description of the masked robber fitted Gonzalez. More damning of course was the presence of both men in a car fitting the description of that driven to and from the laundry. Patrolman Guzzo who was on patrol shortly after 1:20 P.M. about one mile from the scene of the robbery observed Castellano [10] driving the car which at trial he identified as the one Gonzalez was driving just prior to his arrest. At about 2 P.M. the day of the robbery, Richard Phillips testified that both Gonzalez and Castellano came to his home and asked him to ride with them to Copiague. Castellano was then unshaven, the description given by those who viewed him on the robbery scene. Phillips further testified that while he and Gonzalez stopped at a diner Castellano went to a barber and then came back freshly shaved. The three men were then observed driving in the blue Chevrolet by Detective Moran who identified Gonzalez as the driver and Castellano as a passenger. Gonzalez fit the description of one of the robbers "male, white, early twenties, dark hair, heavy set and 5'10''". When the police car moved up to the Chevrolet, Gonzalez was showed the police shield and first slowed down, then suddenly accelerated. Gonzalez ran out of the car but Castellano was arrested. The Suffolk County Police were then alerted and at about 3:25 P.M. Patrolman Shirvell observed Gonzalez stepping into an outdoor phone booth. Gonzalez again ran away and refused to stop when warned and kept running even when shots were fired. Assistance was called for and Patrolman Carter observed a man running who fit Gonzalez' description. After another chase and a struggle Gonzalez was finally handcuffed.

While no single circumstance here was damning, the accumulated circumstantial evidence in our view fully substantiated the fact that Mrs. D'Amora accurately identified Gonzalez. All of this evidence was before the jury. In our view Gonzalez was accorded due process and his conviction was proper and without constitutional taint.

The State argues that the Gonzalez confession although not complying with

---

8. Although the cashier's office was up a flight of stairs and off a main office which had an unmarked door, no witness could recall directing the robbers to the cashier's office. Drivers of course would be aware of its location, since they had to make their reports in an office adjacent the cashier's office.

9. It was just prior to the robbers' ascent of the stairs that Gonzalez donned his mask. While it was necessary for the drivers to visit the upstairs offices in order to make their reports, there was testimony at trial that they did not frequent the front offices occupied by Clarke and D'Amora; there was another entrance to the upstairs offices.

10. While Guzzo could not identify Gonzalez as being the second man in the car, he described him as being heavyset and having brown hair.

*Miranda* was in fact voluntary and although inadmissible on trial, is admissible on this proceeding. This is a novel proposition not supported by any authority and was rejected by the court below. In view of the disposition we have made, we do not reach the point.

Reversed.