**UNITED STATES ex rel. Alton CANNON,**
**Appellant,**

v.

**Ernest L. MONTANYE, Superintendent,**
**Attica Correctional Facility,**
**Appellee.**

Nos. 122, 123, Docket 73–1605, 73–1606.

United States Court of Appeals,
Second Circuit.

Argued Sept. 14, 1973.

Decided Oct. 19, 1973.

Frederick A. Provorny, New York City, for appellant.

Burton Herman, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N.Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for appellee.

Before LUMBARD, FRIENDLY and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

In January 1969, after a jury trial in Monroe County Court, Rochester, New York, Alton Cannon was convicted of the first degree rape of Shirley Rippel. He was given an indeterminate sentence of six years and eight months to 20 years in prison. On appeal, the case was remanded by the Appellate Division to the trial court for further proceedings to determine if appellant had waived his right to counsel at a lineup. People v. Cannon, 33 A.D.2d 641, 305 N.Y.S.2d 106 (4th Dep't 1969). Waiver having been found,[1] the Appellate Division affirmed the conviction without opinion, People v. Cannon, 33 A.D.2d 1104, 309 N.Y.S.2d 894 (4th Dep't 1970), and the New York Court of Appeals denied review.

Subsequently, appellant twice petitioned the United States District Court for the Western District of New York for a writ of habeas corpus. He now appeals from orders of Chief Judge John O. Henderson and Judge Harold P. Burke denying the applications without a hearing.[2] For reasons stated below, we remand to the district court for further proceedings in accordance with this opinion.

I

■ Appellant first contends that the state court erroneously permitted the prosecution to refer to a suppressed typewritten confession and indirectly reveal its contents. The issue arose in the following context: Five days after the rape of Mrs. Rippel, the police picked up appellant for questioning. At a *Huntley* hearing shortly before trial, Detective Mahoney testified as follows: From 8:30 to 8:45 A.M., Cannon made oral admissions concerning both the Rippel incident and unrelated attacks on Marilyn Stevens and Rose Sprague. At 8:45 A. M., the police took a question and answer statement transcribed by a stenographer, which we will call the stenographic statement, relating to the Stevens case. At 9:15 A.M., a typewritten statement was prepared concerning the Sprague complaint, and signed by Cannon. Between 9:40 and 10:00 A.M., a typewritten statement was made dealing with the rape of Shirley Rippel, and was signed.

Because the stenographic statement showed that Cannon twice requested a lawyer before making it, the trial judge suppressed that statement and the later two signed statements as well. However, the judge refused to bar evidence of Cannon's earlier oral admissions[3] made before any request for counsel. The "cut-off" point was 8:45 A.M., the time when the stenographic statement was started.

1. People v. Cannon, 61 Misc.2d 171, 305 N.Y.S.2d 108 (Monroe Cy. Ct. 1969).

2. Appellant filed his first petition in November 1970. Chief Judge Henderson denied it, without prejudice to renewal upon a showing of exhaustion of state remedies. Thereafter, Cannon filed a certificate of the New York Court of Appeals declining review of his case; in June 1972, Judge Henderson denied the petition on the merits. Appellant submitted his second application for relief in October 1972. In February 1973, Judge Burke refused to issue the writ on the ground that Cannon's petition was the same as the one already denied.

3. Appellant also disputes the failure to strike these oral admissions. This issue is discussed below.

At the trial, Detective Funk, who had not been called at the *Huntley* hearing, corroborated Detective Mahoney. (The latter also testified, in substance repeating his earlier account given at the *Huntley* proceeding.) On cross-examination, appellant's counsel sought to impeach Detective Funk by reading from his testimony at a preliminary hearing where he had stated that Cannon was first questioned on the Rippel case at 9:30 A.M., 45 minutes after the crucial cut-off time. Detective Funk affirmed the accuracy of the preliminary hearing version and said: "That was the first statement we took in regards to this [Rippel] incident." On redirect, the officer testified that the word "statement" referred to a signed typewritten statement and that an oral statement had been obtained at 8:30 A.M. The prosecutor then showed the signed statement to Detective Funk. After various remarks identifying it (to which appellant's counsel took a continuing objection), the following colloquy ensued:

Q. And in sum or substance does that document relate what the defendant previously told you orally?

A. [Detective Funk] Yes sir, it is.

Appellant's primary argument is directed to this exchange. According to him, even if reference to the suppressed typewritten statement can be justified as an attempt to rehabilitate Detective Funk (a point he does not concede), the "sum or substance" comment clearly exceeded this purpose and permitted the jury to consider the statement's contents in violation of due process. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Furthermore, appellant contends, the judge enhanced the prejudicial effect by allowing the jury to hear the detectives' testimony again [4] and by refusing to charge that the jurors should ignore the typewritten statement and anything connected with it.

The judge, however, did give a limiting instruction. A few hours after the jurors retired, they returned and asked the court whether they could consider the typewritten statement as evidence. The judge responded as follows:

Reference was made to [the statement] on one or more occasions, that one was typed, where it was typed and some of the circumstances concerning it.

Now these references are testimony and may be considered by you. However, the statement itself was never introduced into evidence, and therefore you may not consider it as evidence.

The jury again retired and several hours afterward returned a verdict of guilty.

Appellant argues that the sequence of events recited above resulted in reversible constitutional error. However we might feel if these were the only relevant facts before us, another portion of the trial record is crucially important. Appellant took the stand in his own defense and denied that he had ever attacked, or even seen, Mrs. Rippel or that he had orally admitted committing the rape. In cross-examination, the prosecution tried to use the suppressed statement to impeach defendant's credibility, but the trial judge barred this tactic. The trial antedated the decision of the Supreme Court in Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), which held that a *Miranda*-violative statement could be used to impeach the accused's credibility, so long as it had not been coerced and a limiting instruction was given. See also Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (impeachment on collateral matter).

With the 20-20 hindsight afforded by *Harris,* we now know that the prosecutor, with the requisite foundation, could properly have utilized the typewritten statement under an instruction that the

---

4. After several hours of deliberation, the jury returned to the court and asked to hear for a second time the entire testimony of Detectives Mahoney and Funk. The request was granted.

jury could consider it on credibility alone.[5] Cf. United States v. Briggs, 457 F.2d 908 (2d Cir.1972), cert. denied, 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1973). Here the prosecutor's witness testified only obliquely to the contents of the writing by stating that in "sum or substance" the typed statement incorporated the earlier oral admissions. Furthermore, the judge charged the jury, in effect, that it could not consider the statement itself as evidence *on any issue.* Cf. United States v. Kahan, 479 F.2d 290 (2d Cir. 1973) (no limiting instruction). Although the prosecutor should not, in his case in chief, have placed before the jury even indirectly the substance of the statement, the mistake would have had no independent significance had the trial judge allowed the prosecutor proper latitude in cross-examination. Nonetheless, appellant urges this court to reject the implications of *Harris* because of the chance that "appellant would not have taken the stand if the existence and contents of the typewritten statement had not been revealed to the jury. . . ." The present circumstances, however, render this possibility very remote. Given the verbal admissions, which were properly before the jury,[6] and the lack of direct reference to the matter in the People's closing argument, the "sum or substance" remark could have added only marginal strength to the prosecution's case. We are persuaded beyond a reasonable doubt that this evidence was not a substantial factor in inducing appellant to testify, and that therefore its admission did not prejudice Cannon by unreasonably burdening his right to remain silent. Cf. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

In addition, it is worth noting that the jurors showed every indication of being thoughtful and receptive to the court's guidance. No less than four times, the jurors returned to the courtroom to seek further enlightenment. On one of these occasions, as indicated, they asked for instructions regarding the appropriate use of the very statement in issue. Therefore, one may realistically assume that the jury obeyed the judge's charge—a charge that, in light of *Harris,* was overly favorable to appellant—and declined to consider the substance of the statement as evidence. On these facts, we decline to rule that appellant was denied due process.

## II

Appellant further contends that he was denied due process by Mrs. Rippel's identification of him at trial and by admission of evidence of her prior lineup identification. Specifically, he claims that the lineup was unduly suggestive and violated the fourteenth amendment. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); see also Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). At a *Wade* hearing held just before trial, appellant testified that Lieutenant Reiss, who picked him up at home in the early morning five days after the rape, told him to wear a green sweater.[7] He did so, and later that morning at a lineup was named by Mrs. Rippel as her assailant. This fact assumes significance because of the Lieutenant's prior testimony given at the *Huntley* hearing. There, he stated that before picking up appellant, he had read the complaints of the women in the three cases in which he suspected Cannon, noted that in two of the incidents the attacker wore a green shirt and further recalled that Cannon had on a similar garment at the time of their initial meeting earlier that day.

The victim testified at the *Wade* hearing that she had viewed appellant at a

---

5. Neither side originally made any argument based upon *Harris,* but we called the point to the attention of the parties, and asked for, and received, post-argument briefs on the issue.

6. See part III *infra.*

7. At the trial, appellant reiterated this evidence with the added fact that he had originally been getting ready to put on a different sweater. On cross-examination, Lieutenant Reiss corroborated the story.

lineup and selected him from among five Negro males. By the time of the hearing, she could not recollect what the others had worn; she did, however, remember that appellant—like her attacker—had been wearing a green shirt. In addition, her testimony at trial revealed that she had never seen her assailant's face. (Mrs. Rippel's observations were understandably limited since she was assaulted at night on the street, grabbed from behind and raped with her skirt held over her head.)

Detective Mahoney, too, gave evidence at the *Wade* hearing. He was the only one to describe the other men in the lineup in relationship to Cannon. According to the officer:

> They were all of within an inch or two or approximately the same height and approximately the same in weight. *And one or two approximately the same in dress.* (Emphasis added.)

Detective Mahoney did not, however, testify—indeed, he was never asked—about the color of the clothing of the other men in the lineup or whether any of them wore green.

■ In confrontations of this kind, the Supreme Court has held that due process is violated whenever an identification device is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [8] Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The test is extremely general, and in each case one must examine the totality of circumstances to determine whether the challenged procedure infringed constitutional rights. See, e. g., Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); United States ex rel. Gonzalez v. Zelker, 477 F.2d 797 (2d Cir. 1973).

Assuming arguendo that appellant was the only man in the lineup wearing a green shirt, we might well be disposed to hold that the identification method was impermissibly suggestive. See Foster v. California, 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) (among other things, defendant only man in "leather jacket similar to that worn by the robber"). But cf. United States ex rel. Anderson v. Mancusi, 413 F.2d 1012, 1014 (2d Cir. 1969) (defendant's red shirt "stood out like a neon sign"). This conclusion would be fortified by the indication of police complicity in arranging an unfair lineup. Cf. United States ex rel. Gonzalez v. Zelker, supra, 477 F.2d at 803.

■ However, even a finding of unnecessary suggestiveness need not require the exclusion of identification evidence. One must then assess the likelihood of misidentification by weighing such external factors as

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

At the end of the *Wade* hearing, the state judge held that the lineup was constitutionally valid. He therefore denied appellant's motion to suppress Mrs. Rippel's lineup and in-court identifications. We are commanded to accord great weight to the findings of the state trial judge, 28 U.S.C. § 2254(d), "who saw and heard the witnesses," United States ex rel. Phipps v. Follette, 428 F.2d 912, 915 (2d Cir. 1970). Cf. United States ex rel. Miller v. LaVallee, 436 F.2d 875, 876–877 (2d Cir. 1970). As noted previously, however, the *Wade* hearing did not elicit any comparative evidence on the colors worn by the other men at the

---

8. See also Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), barring confrontations that are "unnecessarily suggestive and conducive to irreparable mistaken identification."

lineup. If all were dressed in green the inference of undue suggestion would clearly fail. If one or two had on green shirts, the inference would weaken very considerably. On the other hand, if the inference remained, it would acquire great importance in a case where the victim's "opportunity . . . to view the criminal at the time of the crime" was limited, as appears to be the case here. Neil v. Biggers, *supra*, 409 U.S. at 199, 93 S.Ct. at 382.

■ Apparently, neither the state trial court nor the federal district court focused on this aspect of appellant's claims. Moreover, as already indicated, the record on a significant factual question is sparse. Under these circumstances, we decline to decide the ultimate issue of taint. Because "the material facts were not adequately developed at the State court hearing," 28 U.S.C. § 2254(d)(3), we remand to the district court to conduct a further *Wade* hearing, taking into account the factors which we have cited, or, in the alternative, to hold the case in abeyance so as to allow the state tribunal to oversee such proceedings.

### III

■ Appellant raises two additional points in his brief. He challenges the state court's finding at the *Huntley* hearing that, as to the oral admissions, appellant voluntarily and knowingly waived his *Miranda* rights. On this issue, however, appellant had a full and fair hearing on the facts. The trial judge determined the matter adversely to him on the merits. We see no reason to substitute our judgment for his and, therefore, hold that the oral statements were properly received in evidence.

■ Finally, appellant contends that his conviction in the absence of any admissible evidence violated his right to·

due process. Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). Under New York law, the complaining witness' testimony in sexual offense cases must be corroborated by other evidence tending to prove the crime. N.Y.Pen.L. § 130.15 (McKinney's Consol. Laws, c. 40 Supp.1972). Here, Mrs. Rippel's account at trial was bolstered by appellant's oral admissions which, as we have held, were properly before the jury. Accordingly, there ·is no such failure of evidence as would invalidate appellant's conviction under the *Thompson* rationale.[9]

Case remanded for further proceedings consistent with this opinion. We commend Frederick A. Provorny, as appointed counsel, for his splendid representation of appellant.

FRIENDLY, Circuit Judge (dissenting in part):

This is the rare state prisoner *habeas* appeal where there is reasonable doubt whether petitioner committed the crime. At the time of the alleged rape the victim did not see her assailant's face; she caught only a glimpse of his clothing and noticed that he was wearing a green upper garment. In direct testimony she claimed to have seen Cannon standing across the street from her while she was walking home and to have seen him walking through a gas station across from her shortly before she was attacked, but this was substantially weakened on cross-examination. While I agree that, at minimum, there must be a determination whether the lineup was impermissibly suggestive, I would go further and direct that even if this investigation should be concluded favorably to the State, the writ should nevertheless issue on the usual conditions because the prosecution was improperly permitted to introduce evidence of the contents of the typewritten statement.

9. Of course, if a new *Wade* hearing should invalidate the lineup and in-court identifications, a problem of insufficient evidence— though not necessarily one of due process

dimensions—might conceivably arise. N.Y. C.P.L. § 60.50 (McKinney's Consol.Laws, c. 11–A, 1971) (necessity for corroboration of confession).

The prosecutor's use of the typewritten statement to rehabilitate Detective Funk was highly questionable from the first. In the preliminary hearing, Funk testified unequivocally that Cannon was first questioned about the Rippel incident at about 9:30 a. m. This would be logical since the first written statements, each preceded by oral questioning, related to the Stevens and Sprague attacks. At trial, however, Funk changed his story and said that Cannon had been questioned orally about the Rippel incident at about 8:35 or 8:40 a. m. in between the oral and written statements on the Stevens attack. The difference, of course, was critical—and highly suspect—since the trial judge had found that Cannon requested an attorney in the course of the stenographic statement taken at 8:45 a. m. and had therefore properly excluded any of Cannon's admissions made thereafter. On cross-examination, defense counsel read at length from Funk's testimony at the preliminary hearing. Funk insisted that this testimony was accurate, in spite of the clear conflict between it and his testimony on direct examination at the trial. Defense counsel concluded his cross-examination with the following exchange:

Q. Well, at that time, fifteen days after the questioning, was that a true statement you made that at about 9:30 you questioned him about this incident?

A. Yes, sir. That was the first statement we took in regards to this incident.

Q. At 9:30?

A. At 9:30, yes sir.

Immediately thereafter, on redirect examination, the prosecutor seized upon the word "statement" in Funk's penultimate response and utilized the latent ambiguity in the word as a wedge:

Q. What do you mean by "statement," Detective?

A. Statement would be something which was transcribed onto paper. In other words, a stenographic statement or a statement which we would type ourselves in response to our questions.

Q. So, you're referring to these later questions, or statements as you call them, after nine o'clock to what?

A. To the statement which we took from Mr. Cannon on the typewriter.

While it hard to avoid believing that the detective and the prosecutor had prepared this "rehabilitation" by arranging for the detective to use the word "statement" on cross-examination, we need not go on that ground. Once the ambiguity about the word "statement" was established and Detective Funk asserted he had been referring to the later typewritten statement, the rehabilitative purpose of the redirect examination was achieved. Yet the prosecutor did not rest at that point but proceeded to introduce as much evidence about the *contents* of the statement as he could.

The prosecutor first asked Detective Funk to describe how the statement was taken; he then elicited the testimony that Cannon had signed the statement; and finally, and most important, he asked, "And in sum or substance does that document relate what the defendant previously told you orally?" Funk answered, "Yes, sir, it is."

This testimony brought out critical information about the contents of the typewritten statement, which went well beyond any legitimate rehabilitative purpose. Coming in the wake of detailed accounts of Cannon's alleged oral admissions, Funk's testimony amounted to far more than an "oblique" reference to the contents of the typewritten statement, as the majority characterizes it. In effect, it constituted direct evidence that Cannon had signed a written confession of guilt, which the jury could use to convict him or to buttress testimony about his alleged earlier oral admissions.

The majority concludes that the judge's instructions to the jury were sufficient to cure any error in admitting evidence

of the contents of the statement. I disagree. After having deliberated for about two hours, the jury asked the court, "Can we consider the typewritten statement of Cannon as evidence?" The court responded as follows:

> My response to that . . . is that a typewritten statement of Cannon was alluded to during the trial and was marked for identification. Reference was made to one on one or more occasions, that one was typed, where it was typed and some of the circumstances concerning it.
>
> Now, these references are testimony and may be considered by you. However, the statement itself was never introduced into evidence, and therefore you may not consider it as evidence. All right?

The jury's question makes it clear that they were seeking advice whether they could consider the testimony about the contents of the typewritten statement as evidence of Cannon's guilt. The natural interpretation of the court's answer would be that they could consider all the testimony about the statement *for any purpose*, but they could not consider "the statement itself," since the piece of paper containing the statement had never been introduced into evidence. Under this direction, it seems entirely likely that the jury understood that it could consider Funk's testimony that the typewritten statement and the oral statement were identical in "sum´and substance," and that it could rely on Funk's characterization of the contents of the typewritten statement in determining guilt or innocence.

Partly on the basis of its erroneous analysis of the court's instruction, the majority proceeds to conclude that Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), rescues the conviction. The argument is that since the judge could have allowed the prosecutor to introduce the typewritten statement to impeach Cannon, his error in admitting evidence of the contents of the statement "would have had no inde-

pendent significance had the trial judge allowed the prosecutor proper latitude in cross-examination." However, use of the contents under *Harris* would have had to be strictly limited to impeachment. Assuming, as the Court did in *Harris*, that a properly instructed jury can distinguish between use for impeachment and use in the case in chief, the introduction of the typewritten statement solely for impeachment would have had no such destructive effect as it did. Although the majority appears to doubt a jury's power to make such fine distinctions, the belief in this ability lies at the heart of *Harris*. Moreover, the jury in this case seemed exceptionally receptive to limiting instructions. The question to the trial judge invited an instruction that they must ignore the contents of the typewritten statement. Unhappily, while that instruction was required, it was not given.