432 F.2d 577
 UNITED STATES of America, Appellee,
v.
Fred Junior EDMONS, also known as Dawud Abdul Rahman,
Carlton Kelly, also known as Umar Abdur Rasheed, Lamon Hamp,
also known as Muser Abdul Malik, Robert R. Williams, also
known as Saloudin Abdul Salam, Eddie Gibson, also known as
Safwan Abdullah, Eugene C. Spencer, also known as Husain
Abdul Mahmood, Ronald Oliver, also known as Muhammad Abdul
Lateef, Defendants-Appellants.
 Nos. 876-882, Dockets 34266-34272.
 United States Court of Appeals, Second Circuit.
 Argued July 8, 1970.
Decided Oct. 5, 1970.
 
 David G. Trager, Asst. U.S. Atty. (Edward R. Neaher, U.S. Atty., for the Eastern District of New York, Brooklyn, N.Y., and Daniel M. Armstrong, Asst. U.S. Atty., of counsel), for appellee.
 Victor Rabinowitz, New York City, for defendants-appellants.
 Before FRIENDLY, SMITH and HAYS, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 The appellants from this judgment of conviction after a verdict, in the District Court for the Eastern District of New York are Orthodox Moslems. They refer to themselves and each other by Arabic names, as their counsel also did on many occasions during the trial. The law enforcement officers who testified against them and the prosecutor generally used their Christian names. On appeal both counsel have done the latter save in the case of Carlton Kelly who is almost always referred to as Rasheed. We shall follow counsels' usage.
 
 
 2
 The convictions were on three counts of an indictment. All seven appellants were found guilty of having violated 18 U.S.C. 111 by forcibly opposing, impeding and interfering with special agents of the F.B.I. in the performance of their duties. Edmons, Rasheed, Hamp, Gibson and Spencer were found guilty of having violated the same section by forcibly assaulting F.B.I. agents; Williams and Ronnie Oliver were not named in that count. Six appellants were found guilty of having violated 18 U.S.C. 752(b) in aiding and assisting in the escape of a person lawfully arrested on a warrant charging the commission of a felony while such person was in the custody of the F.B.I.; there was a disagreement about Ronnie Oliver's guilt.[1]
 
 I.
 
 3
 The facts are dramatic. Late in the afternoon of November 6, 1968, four special agents of the F.B.I.-- Mulhall, Jones, Good and O'Brien-- went to 327 Sumpter Street, Brooklyn, to execute a warrant for the arrest of Reggie Oliver for a violation of the Selective Service Act. The agents wore work or sports clothing, and utilized an unmarked sedan and a panel truck marked 'Ajax Plumbing & Supply.' Oliver's description was known to them and one of the agents carried his photograph.
 
 
 4
 As darkness approached, they observed Oliver leave the premises and then return, after which a third floor apartment was lighted. When he did not emerge, the agents entered the building and knocked on the apartment door. Oliver's wife, Shirley, answered; the agents inquired as to his whereabouts and explained they were with the F.B.I. Oliver's sister-in-law, Leslie May, allegedly the owner of the apartment, then appeared; she was shown their credentials and told of the warrant for Oliver's arrest. When she refused to allow them to enter, the agents pushed their way in. After having partially subdued the women, who had struck them with a staff and a hammer, they found Oliver and informed him of the arrest warrant. The women became vociferous and Oliver began shouting in some foreign language, presumably Arabic. A violent struggle, with the women joining in, ensued, and a shot went through the ceiling when Oliver tried to kick Mulhall's gun out of his hand. Finally O'Brien succeeded in putting handcuffs on Oliver, who then said to the women in English, 'Get the brothers.' Leslie May passed the message on to Shirley Oliver, who immediately ran out of the apartment.
 
 
 5
 As the agents left the building with Reggie Oliver, who was still struggling, they were confronted by defendant Rasheed, armed with a long stick. Some ten or twelve persons were on the street or just coming around the corner; Shirley Oliver was with them. The agents identified themselves to the crowd both orally and by showing their credentials, and attempted to take Reggie Oliver across the street to the panel truck. By this time the mob had grown to some 40 to 50 persons; they surrounded the truck, shouted the epithets now all too commonly applied to law enforcement officers, and threatened to kill the agents if their 'leader' were not released. Many carried clubs, long sticks and machetes; the agents were pushed, shoved and assaulted. They again displayed their F.B.I. credentials and proclaimed their identity, but to no avail. After a few minutes Mulhall succeeded in extricating himself in order to get help from the city police.
 
 
 6
 At one point defendant Edmons made a motion as if to draw a gun, and agent O'Brien drew his in response. In doing this he released his hold on Reggie Oliver who struck him, broke loose and escaped into the crowd; he was last seen walking off with his wife, his sister-in-law and others.
 
 
 7
 A few moments later agent Mulhall returned with the police. Rasheed and Edmons were arrested then and Hamp was arrested then or shortly thereafter. A holster and a pouch of bullets were found on Edmons and a revolver was located in the rear seat of the police car in which he had been brought to the station house.
 
 
 8
 Seeking Reggie Oliver and those who assisted his escape, F.B.I. agents, including O'Brien, visited the area later that evening. After searching Leslie May's apartment, where O'Brien allegedly met Gibson on the front stoop, they headed for a building at 240 Sumpter Street, one block away. When no one responded to their knocking at the first floor apartment, they broke down the door and conducted a search. Then with guns drawn, the agents proceeded up the hallway steps to a Moslem mosque on the top floor, which they were permitted to enter. Ronnie Oliver and allegedly Spencer and Williams were there but were not arrested.
 
 
 9
 Quite understandably the F.B.I. considered itself obliged to make further efforts to locate Reggie Oliver and others who had engaged in this outrageous affair. Our concern is with the method used. Next morning at the F.B.I. headquarters some 50 or 60 agents gathered at a meeting chaired by supervisory officials. The agents were informed about the affray and were sent back to the neighborhood with directions to proceed to 240 Sumpter Street. The apprehension of Reggie Oliver, whose photograph was distributed, and the two women was the prime objective. However, one agent conceded having been told that if they found any others who had taken part in the assault, they could make arrests for failure to have identifications, notably Selective Service cards. Just how they were to locate such persons is not apparent. None of the four agents who had been the victims of the assault accompanied them, Mulhall, Jones, and O'Brien being busy with the arraignment of the three defendants arrested on the previous evening, and they were given no description except that the members of the mob were young and black.
 
 
 10
 Early in the afternoon the agents returned to headquarters with five prisoners, appellants Williams, Gibson, Spencer and Ronnie Oliver, and one Pacheco. All had been arrested for failure to have Selective Service cards in their possession, although several asserted these were available in their homes nearby.[2] No effort was made to take the men before a United States Commissioner after they had been fingerprinted and photographed. Some were not questioned; others were interrogated about Reggie Oliver and the events of the preceding evening. Between 3:30 P.M. and 5:15 P.M. Mulhall, Jones, and, a bit later, Good returned to F.B.I. headquarters from other assignments; O'Brien, who had suffered most severely on the previous evening, went home directly from the courthouse in Brooklyn. When the three agents arrived, Gibson and Williams were in a large room where a number of agents had their desks, Spencer was in one interview room, and Ronnie Oliver and Pacheco in another. Mulhall immediately recognized all but Pacheco as having participated in the affray. Jones told Mulhall that he also recognized Gibson and Williams; he thought Ronnie Oliver 'looked like the individual who walked up to Agent O'Brien that night of the 6th and asked him 'Where are you taking my brother?," but was not positive of his ability to identify either Oliver or Spencer. Good was positive about Spencer and thought the others were part of the mob but was not certain about this. The Commissioner's office having then closed for the day, the prisoners were detained over night and, except for Pacheco, were arraigned the next morning on charges of assaulting and interfering with a federal agent. Agent O'Brien saw the four appellants then. He said that he was positive with respect to Williams; that he thought Ronnie Oliver resembled an individual who grabbed him but could not be sure; that Spencer 'strongly' looked 'like a person who was in the mob'; and that he could not identify Gibson. The net of all this is that Mulhall, whose presence at the scene was shortest in duration, was positive with respect to all four appellants, Jones with respect to Gibson and Williams, Good with respect to Spencer, and O'Brien with respect to Williams.[3] Thereafter Mulhall and O'Brien returned to the Sumpter Street area but made no further arrests.
 
 
 11
 At the trial the four appellants arrested on the morning after the affray claimed they had been in the Moslem mosque when it occurred; Edmons, Rasheed and Hamp admitted having been present but denied having participated in the mob's action and having known that the F.B.I. agents were what they were.
 
 II.
 
 12
 It is contended on behalf of the four appellants taken to the F.B.I. headquarters that the identification testimony of all the agents should have been excluded as the fruit of an unlawful arrest, of a lineup conducted in violation of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and of a detention prohibited by F.R.Cr.P. 5(a). We uphold the first contention.
 
 
 13
 The district court found the arrests were illegal, and the Government does not contest this. Although 32 C.F.R. 1617.1 requires a registrant to have his Registration Certificate 'in his personal possession at all times' and 12(b)(6) of the Selective Service Act makes knowing violation of any regulation a felony, appellants' counsel tells us he has been unable to find any case where a person bound to register for Selective Service has ever been prosecuted for inadvertent failure to have his card on his person, as distinguished from having intentionally parted with it; several of the agents testified they had never heard of such a case; and the Government has proffered nothing to the contrary. Moreover, the F.B.I.'s failure to take the five men promptly before a Commissioner and the absence of any proceeding against Pacheco confirm that appellants' failure to have their draft cards immediately available was not the true reason for the arrests and that these were motivated rather by the hope that the agents who had been attacked the preceding evening might be able to identify some or all of the young blacks brought to F.B.I. headquarters. Whether or not the arrests were illegal in the sense that the Government would have been barred from using the fruits of a search, e.g., of defendants' wallets, to show the absence of a Selective Service card, they afforded no lawful basis for procuring evidence with respect to the entirely different offenses for which appellants have been convicted. Cf. Amador-Gonzalez v. United States, 391 F.2d 308 (5 Cir. 1968).
 
 
 14
 Indeed, the Government does not dispute that if a search of the appellants at F.B.I. headquarters had turned up weapons identifiable as having been used during the affray, or if the fingerprints taken there had matched any that were found on the agents' vehicles, see Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), these would have been subject to suppression. But it maintains, as it did successfully below, that the agents' in-court identification testimony[4] stands differently in light of the judge's finding that it 'had an independent origin' within the meaning of United States v. Wade, supra, 388 U.S. at 242, 87 S.Ct. 1926, namely, the agents' observation of the four appellants on the night of the melee.
 
 
 15
 We have recently had occasion to consider the problem, quite similar to that discussed in Wade, of an identification which was prior to that decision and therefore not governed by it, see Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), but was made under unnecessarily suggestive circumstances, United States ex rel. Phipps v. Follette, 2 Cir., 428 F.2d 912 (1970). Recognizing 'there can be no doubt that, once a witness has made an identification, the image of the person identified will remain in his mind to some degree,' we thought the test for the purpose there in hand was whether, before the unlawful identification procedure, 'there was already such a definite image in the witness' mind that he is able to rely on it at trial without much, if any, assistance from its successor.' We also stressed the weight an appellate court must give in such a case 'to the determination of the judge who saw and heard the witness.' If that were the sole issue here, we would uphold the trial judge even in light of the serious criticisms made by appellants' counsel on the score of the agents' problems of observation during the attack upon them and of recollection thereafter, their inability to identify any members of the mob except from the arrested group despite several visits to the area, agent O'Brien's failure to identify Ronnie Oliver and perhaps others later on the night of the fracas, and the rather strange coincidence that four out of five young blacks selected from the neighborhood solely on the basis of their failure to possess draft cards should turn out to have been members of the mob. As against this we are impressed, as Judge Dooling evidently was, by the spontaneity of the agents' identifications only a day or, in O'Brien's case, two days after the event, by the failure of any of them to name Pacheco as a participant, and particularly by the refusal of three to make positive identifications of some of the appellants. Our reading of the record would not lead us to accept appellants' argument that the former was a deliberate ploy and the latter a safe gesture since all the agents knew that each of the four men had been identified by at least one. But we believe the issue here differs from what would be presented in reviewing the effect of a violation of Wade or even of an impermissibly suggestive identification.
 
 
 16
 Both sides agree we must follow the statement in Wong Sun v. United States, 371 U.S. 471, 487-488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963):
 
 
 17
 We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959).
 
 
 18
 Unhappily the statement is somewhat Janus-faced. The Government, bearing down on the word 'evidence,' relies on the first sentence of the quotation and also on Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), the appellants on the second.
 
 
 19
 We do not find Frisbie, which sustained a Michigan prosecution of a defendant allegedly abducted from Illinois by Michigan officers, and its predecessors going back to Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), to be a truly persuasive analogy. These cases were decided before the Fourth Amendment as such was held applicable to the states, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and thus rested only on general considerations of due process[5] or, as in Frisbie, also on a claimed violation of the Federal Kidnapping Act. Whether the Court would now adhere to them must be regarded as questionable. See Pitler, 'The Fruit of the Poisonous Tree' Revisited and Shepardized, 56 Calif.L.Rev. 579, 599-601 (1968). Furthermore, Frisbie v. Collins arose on an application for federal habeas corpus filed many years after Collins' state trial at which no objection appears to have been raised, and the Court's opinion has overtones of the historic limitation of habeas corpus to jurisdictional matters which was to be repudiated at the next term in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953).
 
 
 20
 The case here differs significantly from most that have dealt with the use of 'fruits' of illegal arrests. The arrests here violated the Fourth Amendment not because law enforcement officers crossed the line, often a shadowy one, that separates probable cause from its lack, but because they deliberately seized the appellants on a mere pretext for the purpose of displaying them to the agents who had been present at the scene of the crime. Furthermore it is not disputed that these arrests were a necessary cause for the in-court identification testimony; despite the images in the agents' minds they were unable to identify anyone else, including one or more of the appellants, on their subsequent trips to the area. The case is thus not at all within Judge Sobeloff's statement in Sutton v. United States, 267 F.2d 271, 272 (4 Cir. 1959):
 
 
 21
 It is one thing to say that officers shall gain no advantage from violating the individual's rights; it is quite another to declare that such a violation shall put him beyond the law's reach even if his guilt can be proved by evidence that has been obtained lawfully.
 
 
 22
 Neither is it within the second decision in Bynum v. United States, 107 U.S.App.D.C. 109, 274 F.2d 767 (1960), upholding a conviction of an illegally arrested defendant on the basis of fingerprints previously in the Government's files; the prosecution had come to know Bynum's name, which would have sufficed to guide it to the fingerprints, in an entirely lawful way, see Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465, 467 (1958).
 
 
 23
 It has been well said of the statement by Professor Maguire endorsed in Wong Sun that 'the sense of purposiveness and self-seeking of the term 'exploitation' is striking, and serves as a reminder that an exclusionary rule is a deterrent device.' Ruffin, Out on a Limb of the Poisonous Tree: The Tainted Witness, 15 U.C.L.A.L.Rev. 32, 38 (1967); see also Pitler, supra, 56 Calif.L.Rev. at 588-89. Here the illegal arrests produced the precise results for which they were designed. When the police, not knowing the perpetrator's identity, make an arrest in deliberate violation of the Fourth Amendment for the very purpose of exhibiting a person before the victim and with a view toward having any resulting identification duplicated at trial, the fulfillment of this objective is as much an exploitation of 'the primary illegality' as where a defendant is arrested without probable cause in the expectation that a search or the taking of fingerprints, see Davis v. Mississippi, supra, 394 U.S. 721, 89 S.Ct. 1394; Bynum v. United States, supra, 104 U.S.App.D.C. 368, 262 F.2d 465, will yield evidence that will convict him of a crime[6] and the illegally seized objects or fingerprints are introduced at trial. We are not obliged here to hold that when an arrest made in good faith turns out to have been illegal because of lack of probable cause, an identification resulting from the consequent custody must inevitably be excluded. But in a case like this, where flagrantly illegal arrests were made for the precise purpose of securing identifications that would not otherwise have been obtained, nothing less than barring any use of them can adequately serve the deterrent purpose of the exclusionary rule.[7]
 
 
 24
 We see no inconsistency between our holding with respect to the Fourth Amendment claim and our belief that we would have reached a different conclusion with respect to a violation of Wade if violation there was. Although in Wade the Court said the quoted statement from Wong Sun was 'the proper test to be applied,' 388 U.S. at 241, 87 S.Ct. at 1939, the application must take account of the different characteristics of the two rules. The Government 'exploits' an unlawful arrest when it obtains a conviction on the basis of the very evidence, not shown to have been otherwise procurable, which it hoped to obtain by its unconstitutional act. It does not 'exploit' a line-up without counsel if it makes no use of what there occurred and satisfies the court that this had no significant effect on the trial testimony. An unlawful arrest is itself an invasion of rights protected by the Constitution, Henry v. United States, 361 U.S. 98, 100-101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Terry v. Ohio, 392 U.S. 1, 16-17, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); a line-up without counsel or an impermissibly suggestive identification becomes one only when it or its alleged fruits are sought to be used in a criminal prosecution. Moreover, in applying the exclusionary rule as a deterrent device, account should be taken of the degree of police misconduct. It would be hard to think of a case where the role of exclusion as a deterrent emerges more clearly than here, where extreme provocation led even the well-trained officers of the F.B.I. into conduct they must have known to be unlawful. In contrast, the main function of the Wade and Stovall principles is to insure that only reliable identification evidence is used at trial, see 388 U.S. at 236-240, 87 S.Ct. 1926. Precise compliance with these rules may often be difficult at the pre-arraignment or pre-indictment stage, and if the trial judge is properly satisfied that the violation affected the in-court identification only insignificantly or not at all and that no injustice could have occurred, undue strictness simply for therapeutic reasons would be unwarranted.[8]
 
 
 25
 Beyond all this, we are here dealing with federal convictions. If we did not consider the exclusion of the in-court identifications to be required by the Fourth Amendment, we would have to consider whether we should not bar them in the exercise of our supervisory power. 'A ruling admitting evidence in a criminal trial * * * has the necessary effect of legitimizing the conduct which produced the evidence,' and 'Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens,' Terry v. Ohio, supra, 392 U.S. at 13, 88 S.Ct. at 1875. It is pertinent also to recall the historic admonition of Mr. Justice Brandeis, dissenting in Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928):
 
 
 26
 If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means-- to declare that the government may commit crimes in order to secure the conviction of a private criminal-- would bring terrible retribution.
 
 
 27
 While the Government's conduct here may not have been criminal, it departed so far from constitutional standards that a federal court could not simply look the other way.
 
 
 28
 It remains only to consider 18 U.S.C. 3502, a part of the Omnibus Crime Control and Safe Streets Act of 1968. This provides:
 
 
 29
 The testimony of a witness that he saw the accused commit or participate in the commission of the crime for which the accused is being tried shall be admissible in evidence in any trial court ordained and established under article III of the Constitution of the United States.
 
 
 30
 While the Government relied on this statute in the district court, although the judge did not, it made no mention of it in its brief here. Our inquiry at argument elicited the response that while the Government did not think invocation of the statute to be necessary, it was not abandoning its reliance. In view of the substantial doubt concerning the constitutionality of this statute, the Government cannot fairly expect a court to apply it without the benefit of a reasoned argument in its support. Moreover, although the words read literally upon the Fourth Amendment aspect of this case, the legislative history indicates that the purpose of Congress was to 'overrule' what it regarded as the indefensible decision in Wade, 90th Cong. 2d Sess., U.S.Code Cong. & Adm.News, pp. 2112, 2139 (1968). Under these circumstances the principle of avoiding constitutional doubts, see, e.g., United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953), would confine the scope of the statute to what Congress is known to have had in mind.
 
 
 31
 Since the Government's case against Spencer, Williams, Ronnie Oliver and Gibson rested solely on identifications made as a result of the illegal arrests and there is no suggestion that anything more could be produced on a retrial, we must not only reverse these convictions but direct dismissal of the indictment against these defendants.
 
 III.
 
 32
 With only Edmons, Hamp and Rasheed left in the case, a single point remains.[9] This is a claim that admission of the holster and bullets taken from Edmons and the gun found in the back seat of the police car was prejudicial to him and, still more so, to the two others.
 
 
 33
 The relevance of the gun, holster and bullets with respect to Edmons is beyond question. Since he was charged with having assisted in the escape of Reggie Oliver, the Government was entitled to prove he had the means to do this. Moreover, the gun played a significant part; it was Edmons' reaching for his pocket as if to draw a gun that led agent O'Brien to release his hold on Reggie Oliver. In addition the gun was relevant to the charges of assault and interference. While the evidence was doubtless 'prejudicial' to Edmons in a merely colloquial sense, courts are not concerned with the type of 'prejudice' resulting from the disclosure of facts constituting an integral part of a crime. The other two appellants stand no better. Rasheed was armed with a long stick and both he and Hamp were alleged to have engaged in violence. The decision to permit the prosecution to offer the gun, holster and bullets did not even approach the outer limits of the court's discretion.
 
 
 34
 The convictions of Spencer, Williams, Ronnie Oliver and Gibson are reversed, with instructions to dismiss the indictment; the convictions of Edmons, Hamp and Rasheed are affirmed.
 
 
 35
 HAYS, Circuit Judge (concurring and dissenting):
 
 
 36
 I concur in affirming the conviction of Edmons, Rasheed and Hamp. I would also affirm the convictions of the other defendants.
 
 
 37
 In applying the exclusionary rule to the agents' courtroom identifications, the majority greatly expands the scope and nature of that rule. Such an expansion is, I believe, unwise as a matter of policy, unwarranted under existing case law, and unnecessary on the facts of this case. 'The (exclusionary) rule is a needed, but grudgingly taken, medicament; no more should be swallowed than is needed to combat the disease.' Amsterdam, Search, Seizure, and Section 2255: A Comment, 112 U.Pa.L.Rev. 378, 389 (1964).
 
 
 38
 Neither the majority nor defense counsel cites an instance wherein a courtroom identification based upon independent on the scene observation has been held subject to the exclusionary rule. I would not extend the rule to cover such identifications.
 
 
 39
 Since the identifications had an independent source,[1] it is difficult to understand how they were tainted even if they had been the type of 'evidence' to which the exclusionary rule is meant to apply. The illegal arrests did not provide the evidence which is excluded. While the opportunity to identify the four appellants would not have occurred but for the illegal arrests, the identifications themselves are derived from a distinguishable and independent source.
 
 
 40
 Not only does the majority expand the exclusionary rule to take in a new class of evidence but it apparently broadens the 'remedial' nature of the rule. Without giving the government an opportunity to reassess its cases against the four appellants, the majority orders the indictment dismissed. While it may be that the government has no other evidence against the four, this court should not so assume. In effect the majority holds that if the police practice is offensive not only must tainted evidence be excluded but the defendants must be granted immunity from prosecution. This too is an unwarranted extension of the exclusionary rule.
 
 
 
 [1]
 The jury found Shirley Oliver guilty of the first and third violations; no appeal on her part is now before us. It disagreed as to Leslie May who was charged with the same two offenses
 
 
 [2]
 Spencer, Ronnie Oliver and Pacheco made known at F.B.I. headquarters that they had served in the armed forces; Spencer displayed his certificate of honorable discharge and Pacheco said he had one
 
 
 [3]
 We have been obliged to dig these details out of the 4000 page transcript, much of which is irrelevant to the appellate issues. Appellants were relieved of filing an appendix, and the Government submitted none. Appellants' counsel naturally contented himself with a summary statement, accurate as far as it goes, that 'Mulhall, Good, and Jones, who had been away from the office on other business, returned to F.B.I. headquarters and identified four of the five persons arrested as having been in the crowd the night before.' The Government's brief and argument did nothing to help us understand what actually occurred. Although we do not consider the details to be significant on the issue we deem dispositive, they could well have been with respect to the claimed violation of Wade
 
 
 [4]
 The Government rested on this; the facts with respect to the agents' prior observation of the four appellants were developed in the defense case
 
 
 [5]
 Even on that basis their validity as applied to cases of flagrant illegality in bringing a defendant before the court has been disputed by distinguished commentators. See Scott, Criminal Jurisdiction of a State Over a Defendant Based Upon Presence Secured by Force or Fraud, 37 Minn.L.Rev. 91, 97-98, 100 n. 40 (1953); Allen, Due Process and State Criminal Procedures: Another Look, 48 Nw.U.L.Rev. 16, 27-28 (1953)
 
 
 [6]
 The case differs in this respect from People v. Stoner, 65 Cal.2d 595, 55 Cal.Rptr. 897, 422 P.2d 585 (1967), where the court, speaking through Chief Justice Traynor, refused to exclude a robbery victim's identification because his court-room identification depended in some degree on a show-up identification which, in turn, depended in part on the robber's wearing clothes obtained by an illegal seizure. See the discussion in Pitler, supra, 56 Calif.L.Rev. at 637-41
 
 
 [7]
 As has been well stated in this context, 'Any other result (than excluding the incourt identification testimony), it seems apparent, would be unsupportable. For it would permit unconstitutional dragnet arrests by the police of Everyman simply for the purpose of holding a lineup * * *.' Broeder, Wong Sun v. United States: A Study in Faith and Hope, 42 Neb.L.Rev. 483, 535 (1963)
 
 
 [8]
 We note that the Wade opinion, after quoting from Wong Sun, cited Hoffa v. United States, 385 U.S. 293, 309, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), where the Court had left open whether the test applied to violations of Sixth Amendment rights was as stringent as for violations of the Fourth. This cryptic refence can hardly be taken as deciding that absolute identity of treatment is required
 
 
 [9]
 Largely on the basis of a comment by the trial judge that to a passerby the objective facts of Reggie Oliver's arrest might have appeared to be a kidnapping, it was argued that the four other appellants lacked knowledge of the agents' identity. As we read the record, only a Rip Van Winkle would have thought this to have been anything other than an arrest, even as a passerby. In any event the four appellants were claimed to have been far more than that and our decisions in United States v. Heliczer, 373 F.2d 241, 248 (2 Cir. 1967), and United States v. Ulan, 421 F.2d 787 (2 Cir. 1970), would drain the point of merit as to them. No claim of lack of knowledge is asserted on behalf of Edmons, Hamp and Rasheed
 
 
 [1]
 See, e.g., Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920)
 'If knowledge of them (facts obtained illegally) is gained from an independent source they may be proved like any others. * * *'