Milton CHAVIS, Petitioner,

v.

Robert J. HENDERSON, Superintendent,
Auburn Correctional Facility,
Respondent.

No. 79 Civ. 2804.

United States District Court,
S. D. New York.

March 31, 1980.

Cahill, Gordon & Reindel, New York City, for petitioner; Dean Ringel, Gary J. Wolfe, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for respondent; Nancy B. Bensal, Deputy Asst. Atty. Gen., New York City, of counsel.

LASKER, District Judge.

Milton Chavis, an inmate in Auburn Correctional Facility, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1970). He was convicted in New York State Supreme Court, Bronx County on October 8, 1975, of robbery in the first degree. On November 19, 1975, he was sentenced to an indeterminate prison term with a minimum of 12½ years and a maximum of 25 years. By his petition, he alleges that: (1) the refusal of the state courts to consider conduct by other than policemen in assessing the propriety of his identification was violative of due process; (2) the actions of the police and their civilian interpreter were highly suggestive and rendered the identification unreliable, creating a substantial likelihood of misidentification; and (3) the identification was the "fruit" of an arrest made without probable cause.

### FACTS

On the afternoon of March 31, 1975, at approximately 4:30, the complainant, Mrs. Soto, returned from shopping. Upon entering her building at 1161 Shakespeare Avenue, she noticed a stranger waiting for an elevator at the other end of the lobby. As she approached, the man moved and stood beside her. When the elevator arrived, he held the door for her but she refused to enter. The man rode up alone.

When the elevator returned to the main floor, it was empty. Mrs. Soto entered and

pressed the button for her floor, but before she reached it, the elevator stopped and the doors opened. A man Mrs. Soto recognized as the stranger she had seen in the lobby stood in the doorway with a knife. He demanded her money. She took out her red change purse, containing 40 or 50 cents, and handed it to him. When the man demanded more money, she gave him her pocketbook and then her wallet. He examined both and, finding them empty, threw them on the floor and fled downstairs. The doors closed and Mrs. Soto continued to fifth floor.

Mr. Rodriguez, a neighbor, was in the hallway working when Mrs. Soto emerged from the elevator, crying hysterically. She told him a black man had just mugged her, whereupon Mr. Rodriguez ran downstairs and into the street in pursuit. As he left the building, he noticed only one person in the vicinity, to whom he yelled out, "Yo". The man wheeled around, presented a knife, and said, "It wasn't me brother," then ran off. Mr. Rodriguez ran after him, and there followed a chase through the neighborhood. At one point, the man dashed across the street and a bus passed between them, causing Rodriguez temporarily to lose sight of his quarry. When the bus had passed, the man was gone. Rodriguez noticed a bar and assumed the man had run into it.

Crossing the street, Rodriguez opened the bar door, looked inside and saw Chavis seated in a booth. Taking a knife from his pocket, he informed those in the bar that Chavis had just robbed "his mother". An auxiliary police officer seated at the bar declared Chavis under arrest and placed handcuffs on him. On the street, the trio were joined by two uniformed policemen who had been alerted by a passerby.

The two officers, Rodriguez, the auxiliary policeman and Chavis then proceeded to the apartment building. There Rodriguez and a police officer went to Mrs. Soto's apartment in an effort to obtain an identification from her. The contents of the conversation that followed were disputed at the trial, but what is clear is that Mrs. Soto was initially reluctant to make an identification (T–74), that Rodriguez served as interpreter (since the police spoke no Spanish) and that he was able to persuade her to come downstairs for the identification (T–75).

Much of the controversy concerns what Rodriguez told Mrs. Soto prior to her identification of the petitioner. At the *Wade* hearing, she testified that Rodriguez told her "he had the man downstairs in the car" (W–24). He "proved it with the small purse I was carrying in my raincoat pocket" which they told her came from the man (W–26–27). On cross-examination, Rodriguez said, "I have no recollection as to what I told her. I generally stated that Police Officer Powers asked me something to the effect could she come downstairs and identify the person we had in the car." (W–71). At the hearing and the trial, she stated she was told that the man was caught coming out of the building (T–73). On the other hand, Rodriguez testified "there was a small purse of change on the outside of the elevator" (W–76), and that when he emerged from the apartment "there was absolutely no one there except a person walking away" (W–65).

Mrs. Soto came downstairs with Rodriguez and the officer, and identified Chavis as her assailant while he was handcuffed seated alongside a police officer in the back of a marked police car. At one point, the petitioner was made to stand alongside the car while Mrs. Soto described her attacker. This was Mrs. Soto's first description[1] and she described the handcuffed man who

---

1. *Wade* Hearing Transcript: Mrs. Soto—Cross Examination

"Q: Did you ever give the police officers a description of the man who supposedly robbed you?
A: Yes.
Q: When did you give such a description and to whom?

A: When I went downstairs with the police officers and Mr. Rodriguez and they had them in the car. They had them detained in the car. (W–31)
&ast; &ast; &ast; &ast; &ast; &ast;
Q: Did you ever tell them anything more than the fact that the man was black?
A: No, nothing else.

stood before her. The petitioner was then taken into custody.

Chavis contends that the judge should have considered statements made by the civilian interpreter in determining whether or not the identification procedure was impermissibly suggestive. At the close of the hearing, the judge noted that if Mrs. Soto had been told that the police had the man who attacked her, it was by Rodriguez and not the officers (W–208). According to the trial judge, only actions by the police could establish a "taint", which made Mr. Rodriguez's comments irrelevant to the question of whether the identification should be excluded. In upholding the admissibility of the identification, the judge relied on various factors which indicated reliability, most notably the period of time Mrs. Soto had the defendant under observation, the short time between the incident and the identification, and a description of the petitioner's clothing (although this was given while the petitioner stood before her) (W–209).

Petitioner was convicted at a jury trial. On November 12, 1976 the Supreme Court, Bronx County denied without opinion petitioner's motion to vacate his conviction (N.Y.Crim.Proc.Law § 440.10). On February 16, 1978, the New York Appellate Division, First Department, affirmed petitioner's conviction without opinion. On April 14, 1978, Chief Judge Breitel denied a petition for leave to appeal to the Court of Appeals. On October 2, 1978, the United States Supreme Court denied a petition for a writ of certiorari. Petitioner then filed this petition challenging both the illegal arrest and the identification.

## I. The Illegal Arrest

### A. Exhaustion

■ The petitioner argues that the arrest by the auxiliary police officer, prior to any

Q: Did he ever ask you what the man was wearing?
A: Yes.
Q: When did they ask you what he was wearing?
A: When they had him downstairs in front of the house. (W 33)

 * * * * * *

identification by the victim, was without probable cause and therefore an illegal "seizure" under the Fourth and Fourteenth Amendments. He first raised this objection in a single spaced, two page footnote in his brief to the Appellate Division. (See Brief for Defendant-Appellant at 24–25 n.*.) The respondent challenges this argument on the ground that petitioner did not afford the state court "[a] first opportunity to hear the claim", Picard v. Connor, 404 U.S. 270, 276, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), when he placed it in a footnote, and that he therefore has failed to exhaust his state court remedies as required by 28 U.S.C. § 2254.

In the footnote, petitioner argued: 1) that an arrest was made without probable cause; 2) that petitioner's identification resulted from this arrest; and 3) that the Fourth Amendment required suppression of the identification. The same points are raised in an identical footnote in his Memorandum of Law in this proceeding. (See Memorandum of Law in Support of Petition for Habeas Corpus, at 23–24). Accordingly, this is not a case in which the petitioner "never . . . presented to the New York state courts the federal constitutional claims which [he] now seek[s] to have adjudicated in the federal courts", Cameron v. Fastoff, 543 F.2d 971, 977 (2d Cir. 1976); nor is it a case where the claim presented to the federal court "is not substantially the same as was presented to the New York courts", Fielding v. LeFevre, 548 F.2d 1102, 1107 (2d Cir. 1977). Other cases cited by respondent are also inapposite: Wilson v. Fogg, 571 F.2d 91, 93 (2d Cir. 1978) ("no mention" of constitutional rights in state court); United States ex rel. Aloi v. Arnold, 413 F.Supp. 1384, 1387 (S.D.N.Y.1976) (petitioner "did not clearly present to the state

Q: At this point that they asked you that, what he looked like and what he was wearing, you had already seen him in the car?
A: Yes, I saw him.
Q: How close to the car did you go to see him?
A: About that close. Two, about two meters." (W 33).

courts the same due process argument he presents here").

In objecting to the placement of this argument in a footnote rather than in a separate point heading within the text, respondent argues that the use of a footnote "failed to adequately focus the attention of the Appellate Division on the merits of the claim . . .". However, the contention is not persuasive where, as here, the footnote is two pages long and raises both the constitutional question and the relevant case law. The Court of Appeals of this Circuit has even found a "fair opportunity" to exist where the issue was raised by only one sentence in the state court brief. *United States ex rel. Leeson v. Damon*, 496 F.2d 718 (2d Cir.) *cert. denied*, 419 U.S. 954, 95 S.Ct. 215, 42 L.Ed.2d 172 (1974). The contention that petitioner has failed to exhaust his state court remedies is without merit.

### B. Lack of Probable Cause

In support of his Fourth Amendment claim, petitioner argues: 1) that he was actually arrested by Officer Beasley, an auxiliary policeman; 2) that the arrest was without the necessary degree of probable cause; and 3) that his identification must be suppressed as the "fruit" of that illegal arrest. Respondent contends that the action taken by Beasley is more properly termed a "detention", or, assuming *arguendo* that it was an arrest, is supported by sufficient probable cause.

■ Officer Beasley testified that, based on the statements made by Rodriguez in the bar, he "arrested" the petitioner (Tr. 222). This consisted of: a) informing the petitioner that he was under arrest; b) placing petitioner's hands on the bar; c) "patting" him down to check for weapons; and d) placing handcuffs on his wrists (T–222, 229). There can be little doubt that this action constituted an arrest. In this connection, it is worth noting also that Beasley was an auxiliary policeman and not a "police officer" (N.Y.Crim.Proc.Law § 1.20(34)). Officer Beasley had no authority to restrain petitioner in any manner other than by arresting him, pursuant to the authority granted any citizen to make an arrest (N.Y. Crim.Proc.Law § 140.30), and such an arrest requires the necessary degree of probable cause.

■ To support an arrest by a police officer or civilian, there must be "reasonably trustworthy information" known to the arresting individual "sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). In a case in which the knowledge of the person making the arrest is derived solely from another, the standard articulated in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)[2] applies. As noted by the Second Circuit:

> "The test under *Aguilar* and *Spinelli*, supra, requires the Government to show (1) that the informant received his information in a reliable way; and (2) that the informant was 'credible'." *United States v. Gonzalez*, 555 F.2d 308, 312 (2d Cir. 1977).

■ The information available to Beasley at the time of the arrest satisfied neither prong of this test. Rodriguez's information was not derived from his personal experience; he chased petitioner without even having a description of Mrs. Soto's assailant. Moreover, Beasley arrested Chavis based on charges made by Rodriguez, who was at that point an agitated man whom Beasley had never seen before and had no reason to assume was a credible informant.

■ Respondent argues that a knife recovered from the booth where petitioner had been seated is sufficient "corroboration" to warrant a finding of probable

---

**2.** Although *Aguilar* and *Spinelli* were search warrant cases, the standard was held to apply to the "assessment of the basis for a warrantless arrest by police officers." *United States v.* *Regan*, 525 F.2d 1151, 1155 (8th Cir. 1975). See also *Spinelli, supra*, 393 U.S. at 417 n. 5, 89 S.Ct. 589 n. 5.

cause. (Memorandum of Law, at 17). However, as Beasley himself testified at trial, the knife was not recovered until *after* petitioner's arrest (T. 222–224), and therefore cannot furnish probable cause for the prior act.

■ Petitioner contends that his identification by Mrs. Soto was an "intangible fruit" of the illegal arrest and is therefore excludable under the Fourth Amendment. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The poisoned fruit doctrine has been held applicable to identifications, *United States v. Edmons*, 432 F.2d 577 (2d Cir. 1970), *Adams v. United States*, 399 F.2d 574 (D.C.Cir. 1968), *cert. denied*, 393 U.S. 1067, 89 S.Ct. 722, 21 L.Ed.2d 710 (1969). Where an individual has been unlawfully detained, as here, admission of the identification thereby procured would be to exploit the "primary illegality", the unlawful arrest. *United States v. Edmons*, 432 F.2d at 584. The identification should therefore have been excluded. However, a finding that there has been a Fourth Amendment violation is not automatically sufficient to support the granting of the writ.

### C. Stone v. Powell

■ The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976). Petitioner argues that *Stone* does not preclude the granting of this writ because: 1) its rationale is not relevant here; and 2) petitioner did not receive an "opportunity for full and fair litigation" of the claim.

In deciding to limit prior permissible subject matter in Fourth Amendment habeas proceedings, the Supreme Court noted: "the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant." 428 U.S. at 490, 96 S.Ct. at 3050. Citing this language, petitioner seeks to limit *Stone's* application to cases of collateral attack on otherwise reliable and probative evidence. The argument runs that where, as here, the reliability of the evidence is itself in question, the rationale of *Stone* should not be applied.

Petitioner's analysis is not supported by a close reading of *Stone*. In *Stone* the Court examined the histories both of the writ and the exclusionary rule to determine whether Fourth Amendment violations warranted habeas corpus relief. Having determined that '[t]he primary justification for the exclusionary rule . . . is the deterrence of police conduct that violates Fourth Amendment rights", 428 U.S. at 486, 96 S.Ct. at 3048, the Court noted:

> "the view that the deterrence of Fourth Amendment violations would be furthered [by extending the rule to habeas proceedings] rests on the dubious assumption that law enforcement authorities would fear that federal habeas review might reveal flaws in a search and seizure that went undetected at trial and on appeal." 428 U.S. at 493, 96 S.Ct. at 3052.

The court rejected this "dubious assumption" and, citing the "windfall afforded a guilty defendant" when probative evidence is excluded, limited the Fourth Amendment as a ground for granting a writ of habeas corpus. Thus, while the court did concern itself with the nature of excludable evidence, it did not limit its holding to cases in which evidence to be suppressed was otherwise reliable.

Petitioner's second argument concerns whether or not he received a "full and fair" opportunity to litigate his claim in the state court. He contends that because the trial was commenced prior to the conclusion of the *Wade* hearing, he was foreclosed from having his suppression motion fully heard. As the transcript makes clear, this arrangement was devised by the court because one of the witnesses, Auxiliary Police Officer Beasley, could not afford to take two days off from work to testify at both a *Wade*

hearing and a trial. The petitioner objected to the arrangement at the time it was proposed, but the judge found that as Mr. Beasley probably would not add anything to the *Wade* issue, there was no prejudice to the defendant. Moreover, the judge suggested to the petitioner that if Mr. Beasley's testimony indicated the identification should have been suppressed, the judge would entertain a motion for a mistrial. This proved unnecessary since Mr. Beasley did not speak Spanish and was unable to understand the conversation between Mrs. Soto, Rodriguez and the police officers.

■■■■ *Stone v. Powell, supra,* provides no standards for determining what constitutes a "full and fair opportunity to litigate" at trial. What *Stone* does make clear, however, is that to show he has been denied this opportunity, petitioner "must demonstrate that the state appellate process was in some equivalent way inadequate to correct errors of the trial court." *Pulver v. Cunningham,* 419 F.Supp. 1221 (S.D.N.Y. 1976), aff'd 562 F.2d 198 (2d Cir. 1977). A footnote in *Stone* provides:

> "In sum, we hold only that a federal court need not apply the exclusionary rule on habeas review of a Fourth Amendment claim absent a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim *at trial and on direct review.*" 428 U.S. at 495, n. 37, 96 S.Ct. at 3053, n. 37 (emphasis added)

Chavis has failed to demonstrate, first, how the hearing arrangement, even though a departure from normal, prejudiced the *Wade* issue since Beasley's testimony was irrelevant to it, or second, the inadequacy of the Appellate Division's review. In sum, there is no showing that he was precluded from a "full and fair opportunity to litigate" in the state courts.

*II. The Identification*

*A.* Wade *Hearing*

Petitioner argues that the state court's failure to consider conduct on the part of civilians, recruited by the police, in assessing the propriety of the identification process is contrary to the requirements of due process, and compels the granting of this writ. It is Chavis' contention that the interpreter made misleading statements to the victim before she viewed the petitioner, so that it was all but inevitable that she would identify the petitioner as the man who robbed her.

Mrs. Soto testified at the *Wade* hearing that Mr. Rodriguez came to her apartment accompanied by a police officer about twenty minutes after the incident, and told her "he had the man downstairs in the car." (W–24) When asked on cross-examination if they told her they had the man who robbed her downstairs, she answered, "Yes, and they proved it with the small purse that I was carrying in my raincoat pocket." (W–27) When asked if the police told her where they got the purse, she said they told her, "He had left it in a corner of the elevator. He had thrown it away." Mrs. Soto was also under the impression that Rodriguez saw the man he chased leave the building; she testified that "[Petitioner] was the only one that went out of the building" (W–23).

Rodriguez disputed Mrs. Soto's recollection of their conversation. On cross-examination, he said he never told her that he chased the man who robbed her (W–71), nor did he tell her they had the person downstairs (W–74). He testified that at no time had he gone beyond a verbatim translation of what the officer said (W–71).

At the the conclusion of the hearing, the trial judge ruled as follows:

> "THE COURT: On the *Wade* Motion to suppress the identification on the taint there is no testimony that indicates that the police officers in any way made any suggestions to the complaining witness Mrs. Soto that they caught the man—Mr. Rodriguez—rather Mrs. Soto indicated originally during the *Wade* Hearing she was asked to come downstairs to see if they had the man and during the trial she testified quite differently indicating that she had been told that they had the man. She also indicated that she spoke primarily Spanish but she said she understood whatever the officer said.

However, after listening to all of the witnesses *I am convinced if she was told that they had the man it would have been by Mr. Rodriguez not by the police officers.* Mr. Beasley's testimony convinced me of that as well as the officer's testimony. I am not sure at this point whether Mr. Rodriguez said anything to her or what Mr. Rodriguez said to her. His testimony at this trial, especially at the end was highly confusing. *However, what he said to Mrs. Soto would not establish a taint. It's only the action by the police that would establish a taint."* (W–208–209) (emphasis added)

The trial judge then held the identification admissible:

". . . there was an independent source because of the period of time that she had the defendant under observation before he entered the elevator and during the commission of the crime and furthermore, the identification by her of the defendant was a very short time later and unlike Mr. Rodriguez who wasn't sure of the exact color of clothing she seemed to remember clearly. I also find her identification in court I find it also to be untainted." (W–209) (emphasis added)

### B. Petitioner's Argument

(1) Petitioner contends that it was incorrect for the trial judge to deem Rodriguez's comments irrelevant to the question of whether unnecessarily suggestive remarks were made to Mrs. Soto. He argues that Mr. Rodriguez's status as an unofficial interpreter does not diminish the significance of his testimony, referred to in the judge's ruling. Petitioner further suggests that if Rodriguez's testimony were properly evaluated as part of the "totality of the circumstances", the effect would have been to demonstrate that the actions of the police and the civilian interpreter were highly suggestive and rendered any identification unreliable.

(2) The initial identification of Chavis was made while he was seated, handcuffed, in the back of a marked police car. The only other occupant was a white uniformed officer. Petitioner argues that the fairness and reliability of the show-up was destroyed by such an arrangement, that an inaccurate identification became all but inevitable, and that the petitioner was, as a result, denied due process of law.

### C. The Role of the Civilian Interpreter

■ The State argues that only official misconduct is relevant in determining whether an identification procedure was impermissibly suggestive. However, it is difficult to understand what authority is relied on to support this proposition. In its Memorandum of Law, the State notes:

"In passing over a petitioner's claim that an identification procedure was impermissibly suggestive, Courts address themselves to the conduct of the police or the prosecutor not the conduct of civilians, bystanders or neighbors. See *Moore v. Illinois*, 434 U.S. 220 [98 S.Ct. 458, 54 L.Ed.2d 424] (1977); *Stovall v. Denno*, 388 U.S. 298 [87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967)." (Memorandum of Law, at 27)

However, nothing in *Moore* and *Stovall* appears to hold that conduct of "civilians" is irrelevant to the validity of identification procedures. While both cases addressed the problem of police conduct, this was because the conduct at issue was a police officer's or a prosecutor's. Neither case supports State's argument that *only* the conduct of public officials is relevant evidence on the question of suggestibility. On the contrary, the court in *Stovall* noted that "a claimed violation of due process of law in the conduct of a confrontation depends on the *totality of the circumstances surrounding it.*" 388 U.S. at 302, 87 S.Ct. at 1972 (emphasis supplied). Deterrence of official misconduct is but one basis for the exclusion of identification evidence, as the cases following *Stovall* have indicated. An equally important consideration is the quality of the evidence itself. In *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), the court observed that "[i]t is the likelihood of misidentification which vio-

lates a defendant's right to due process . . . .". Again, in *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977) the court noted that "reliability is the linchpin in determining the admissibility of identification testimony. . . . ." An identification may be rendered unreliable by other than official misconduct. The peculiarly sensitive nature of eyewitness identification and the problem of reliability, was described by the court:

> "Usually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress. The witness' recollection of the stranger can be distorted easily by circumstances or by later actions of the police. Thus *Wade* and its companion cases reflect the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability." *Manson v. Brathwaite*, 432 U.S. at 112, 97 S.Ct. at 2252.

When the police select as interpreter the very individual who has pursued the man the interpreter thought to be the offender to be identified, the conduct of that interpreter comes within the "totality of the circumstances" to be considered in assessing the reliability of a subsequent identification. To insist, as the State does, that only official misconduct may be examined because only it may be deterred, is to disregard the Supreme Court's concern with the total circumstances under which eyewitness identifications are conducted. The trial judge should have considered the victim's testimony that the interpreter told her the police had the man, as a significant factor in determining whether the victim's identification of Chavis was reliable or not.

*D. Actions of the police and their civilian translator rendered the identification unreliable, creating a substantial likelihood of misidentification.*

 Chavis argues that the initial identification, made while he was seated, handcuffed, in the back of a marked police car, was highly suggestive and rendered the identification constitutionally unreliable. He also claims that the use as an interpreter of the very man who chased and apprehended the petitioner made it all but inevitable that Chavis would be identified as the assailant. Finally, he contends that the interpreter's suggestive remarks to the victim contributed significantly to this outcome.

The State answers that, assuming *arguendo* the procedure was impermissibly suggestive, the victim's identification of the petitioner was, under the totality of the circumstances, nevertheless reliable. The State cites as controlling the "two-pronged" test set forth by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). Under *Neil* the court first considers whether the identification was unduly suggestive; if so, the court must then determine whether the suggestiveness gave rise to a "substantial likelihood of irreparable misidentification." 409 U.S. at 198, 93 S.Ct. at 381, citing *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). This is determined by examining the "totality of circumstances" surrounding the identification, including such factors as: "opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.", *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382.

As has already been discussed, the role of the interpreter, first, in suggesting to the victim that the police had taken her assailant into custody and, second, as a person with an interest in the outcome, is as relevant to the issue of suggestibility as the conduct of the officers who showed the victim a man in handcuffs, sitting in a marked police car. *Manson v. Brathwaite, supra* ; *see also Jackson v. Fogg*, 589 F.2d 108, 112 (2d Cir. 1978) (". . . convictions based solely on testimony that identifies a defendant previously unknown to the

witness is highly suspect. Of all the various kinds of evidence it is the least reliable . . ."); *U.S. ex rel. Thomas v. New Jersey*, 472 F.2d 735, 740 (3d Cir.) *cert. denied*, 414 U.S. 878, 94 S.Ct. 121, 38 L.Ed.2d 123 (1973) ("complete absence of any precautions against suggestibility" relied upon in granting of habeas relief, where suggestion emanated from civilian witness). The role of an interpreter is an extremely sensitive one, and courts have recognized that reliance on an intensely interested party's interpretation of a witness' testimony is misplaced. *See*, e. g., *Prince v. Beto*, 426 F.2d 875 (5th Cir. 1970). The *Beto* court specifically disapproved of the use of the victim's husband as her translator where identification was a crucial issue, and the defendant was accused of burglary with intent to commit rape. ("His interest in the outcome of this suit, and what would be his natural and compulsive desire to see the defendant convicted, gave the husband such a *direct and substantial* interest in the case as to disqualify him to act as an interpreter.") 426 F.2d at 876 (emphasis added). Similarly, where, as here, the interpreter has chased the suspect, cursed him, and threatened him with a knife before others (T–141), he may have such a "direct and substantial interest" in the outcome of the case as to render his conduct at the identification and his testimony at trial subject to careful scrutiny.

In *Liggins v. Snow*, 79 Civ. 304 (LWP) (S.D.N.Y. filed July 2, 1979) Judge Pierce had occasion to address the issues of the role of an interpreter and of the viewing of a suspect in an unmarked police car in identification cases. In *Liggins* two men robbed the victim and her granddaughter in a stairwell of the victim's apartment building. As they fled, the two men were observed by a neighbor out on the street. The neighbor, joined by another, pursued the assailants, lost sight of them, but nonetheless continued the search. A short time later, they spotted one of the men and notified the police. The police arrested the man who was spotted as well as a second man and returned with them to the victim's apartment building.

The victim was unable to speak English so the neighbor who chased and eventually found the suspects acted as interpreter. First the victim was shown the weapons taken from the men and then led to an unmarked police car where the two men were seated. Both she and the neighbor identified the men as the assailants. In determining the procedure to have been suggestive, the court noted as significant factors: the viewing of the accused after identifying the knife; the identification of the petitioner in an unmarked car which the witnesses could have reasonably assumed to be a police car; and the simultaneous identification of the petitioner by the neighbor and the victim, with the neighbor serving as interpreter. (*Id.* at 9–10)

*Liggins* may be said to represent a less egregious situation than the case at bar. There, the car was unmarked, there were no representations by the interpreter as to whom the police were holding nor was there any testimony that the victim was emotionally overwrought, as here.

In *Liggins*, Judge Pierce assessed the overall reliability of the identification under the "totality of the circumstances," *Neil v. Biggers, supra*. His determination that the identification was constitutionally reliable was due primarily to the victim's ability to describe with particularity the clothing of her assailant to her neighbor and the police *prior* to apprehension of the suspects (*Id.* at 10–11). It is just such an unprompted detailed description which is lacking in the instant case.

We conclude that because of the actions of the police and the civilian interpreter, the identification of Chavis did "give rise to a substantial likelihood of irreparable misidentification." *Neil v. Biggers, supra*. When asked to make an identification, the victim was shown only the petitioner,[3] who

3. *See*, e. g., *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1966), "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."

is black, while he was seated in a marked police car, in handcuffs, alongside a white uniformed officer. Moreover, the interpreter's suggestive remarks to Mrs. Soto, motivated by his direct and substantial interest in the outcome, may well have contributed to her identification of Chavis.

### E. The "totality of the circumstances" analysis.

The State maintains that, assuming *arguendo* the identification was impermissibly suggestive, the victim's identification was, under the totality of the circumstances, nevertheless reliable, and did not give rise to a substantial likelihood of misidentification. The State's memorandum analyzes each factor suggested in *Neil*, and argues that suggestibility is overcome by sufficient independent indicia of reliability. Chavis maintains that the victim's identification was not sufficiently reliable, in light of the totality of the circumstances, to overcome the suggestiveness of the procedures employed. Each of the *Neil* factors is discussed separately below.

### (1) Opportunity of the witness to view the criminal at the time of the crime.

The testimony of Mrs. Soto at the *Wade* hearing and the trial indicates that she had a good opportunity to view the offender at the time of the crime. The initial encounter in the apartment lobby occurred about 4:30 P.M. There was sufficient light (it was March) and, because Mrs. Soto testified at both the *Wade* hearing (W–2–3) and the trial (T–21) to a conversation with Chavis in the lobby, there was ample time to observe him. The attack itself took place in a well-lit elevator (T–64), but its duration was only described by Mrs. Soto as "fast, fast" (T–31). However, her inability to testify with precision to the duration of the incident does not mar the value of the testimony as a whole: the witness had a good opportunity to observe her assailant. Thus, this factor supports the State's argument that the identification is reliable.

### (2) The witness' degree of attention.

The testimony from everyone who spoke with Mrs. Soto after the incident (Rodriguez and the police officers) indicates that she was "hysterical" (W–62, 64, 73). She testified to being very nervous both during and after the incident (W–34). While courts have recognized that in some instances a victim is more likely than a casual bystander to notice an assailant's face, *see*, e. g., *Neil v. Biggers, supra, Mysholowsky v. New York*, 535 F.2d 194, 197 (2d Cir. 1976), *United States v. Mims*, 481 F.2d 636, 637 (2d Cir. 1973), such a conclusion does not follow here where the victim suffered such extreme emotional distress. This emotional state continued twenty minutes later, when the police returned for Mrs. Soto's identification and found her "agitated" (T–352). From this testimony, it is fair to conclude that during both the crime and the identification, her degree of attention was diminished by extreme nervousness and agitation. This testimony confirms Chavis' contention that the witness' degree of attention was impaired by the trauma of the robbery.

### (3) The accuracy of the witness' prior description of the petitioner.

Mrs. Soto failed to give any but the most general description of her assailant before the confrontation with him, thereby making it difficult to assess its accuracy. The state terms the transcript "ambiguous" as to whether or not Mrs. Soto gave the police a description prior to viewing Chavis. A closer reading of the transcript reveals no such ambiguity; neither Rodriguez nor the police were given a description any more specific than that the petitioner was a "black man" (W–31, 32) although one officer testified at trial that she might have said "male black wearing dark clothes" (T–367).

Mrs. Soto testified at the hearing that when she was asked by the police to furnish a description of Chavis, he was standing in front of her (see Footnote 1). Under these circumstances whatever degree of accuracy she displayed at that time is meaningless; she described the person she was viewing at that moment. The absence of a prior de-

scription is thus favorable to petitioner because it mitigates any finding of independent reliability. It is just such a detailed description which courts have considered critical for a determination that an identification was nonetheless reliable. Its absence supports Chavis' contention.

### (4) The level of certainty demonstrated by the witness at the confrontation

Mrs. Soto's level of certainty is extremely difficulty to ascertain, given the highly suggestive circumstances surrounding the identification. The officers testifying at trial noted the hysterical demeanor of the witness (T–352, 357). From this testimony it is impossible to determine whether she was certain that the man who stood before her was the assailant or, given her emotional state, she thought the police were telling her it was the assailant. Because of this conflict, and the high degree of suggestiveness at the confrontation itself, it cannot be said that Mrs. Soto's level of certainty at the confrontation favors either Chavis or the State.

### (5) The length of time between the crime and the confrontation

The length of time between the robbery and the confrontation was approximately one-half hour. This period is relatively short compared with other durations accepted in this circuit, see, e. g., *United States ex rel. Carnegie v. MacDougall*, 422 F.2d 353 (2d Cir.), *cert. denied*, 398 U.S. 912, 90 S.Ct. 1711, 26 L.Ed.2d 74 (1970) (identification evidence admitted where show-up occurred three months after the crime); *United States ex rel. Rutherford v. Deegan*, 406 F.2d 217 (2d Cir.), *cert. denied*, 395 U.S. 983, 89 S.Ct. 2145, 23 L.Ed.2d 771 (1969) (identification evidence allowed where show-up occurred ten days after the crime). Here, the proximity between the incident and the identification supports the State's argument that Mrs. Soto was able to accurately identify her assailant because she had only recently observed him.

On consideration of this application of the *Neil* criteria to the case at hand, I conclude that although some factors support Chavis' position and others the State's, the outcome favors Chavis. This conclusion is particularly supported by the highly suggestive identification procedures in which both the police and the interpreter were involved. Moreover, the infirmities present in the showup deserve particular scrutiny when a sentence of 12½ to 25 years hangs in the balance.

For the reasons stated above, the writ of habeas corpus will be granted unless within ninety days Chavis is given a new trial.

It is so ordered.